CROWN CORK & SEAL CO. OF BALTIMORE CITY v. STERLING CORK & SEAL CO.

(Circuit Court of Appeals, Sixth Circuit. October 16, 1914.)

No. 2460.

1. PATENTS (§ 17*)—ADOPTION FROM ANOTHER ART.
    Having gone into another art and adopted a device therefrom, and adapted it to this art, the patentee could not thereafter get a valid patent covering broadly another adoption from the same art for similar purpose.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

There remained open for the later patent only the adaptation not the adoption.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 16, 17; Dec. Dig. § 17.*]

2. PATENTS (§ 328*)—INFRINGEMENT—BOTTLE SEALING MACHINE.

The Painter patent, No. 638,354, for a machine for automatically sealing bottles, the essential feature of which is a yielding plunger on which the bottles rest, construed, and, as limited by the prior art, *held* not infringed.

3. PATENTS (§ 157*)—CONSTRUCTION OF CLAIMS.

Only when necessary to make the claims of a patent operative, or in case of ambiguity apparent on the face of the claims, or induced by their study in connection with the specification and prior art, is a court permitted to read in an element not named therein, in order to narrow a claim so as to make valid one otherwise invalid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229-232; Dec. Dig. § 157.*]

4. PATENTS (§ 328*)—INFRINGEMENT—FEEDING APPARATUS FOR BOTTLE SEALING MACHINES.

The Painter & Hawkins patent, No. 643,973, for an automatic feeding apparatus for bottle-sealing machines, claim 2, construed, and *held* infringed.

5. PATENTS (§ 168*)—CONSTRUCTION—EFFECT OF PROCEEDINGS IN PATENT OFFICE.

The effect of the rejection of a claim by the Patent Office, and an amendment, is not necessarily a limitation, but, even if so, it may not affect the claim in the particular involved in a subsequent litigation, and the exact thing done must be examined from all sides, and especially in connection with the point later in controversy, before its effect can be interpreted.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½, 244; Dec. Dig. § 168.*

Conclusiveness and effect of decisions of Patent Office in proceedings on applications, see note to Novelty Glass Mfg. Co. v. Brookfield, 95 C. C. A. 530.]

Appeal from the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by the Crown Cork & Seal Company of Baltimore City against the Sterling Cork & Seal Company. Decree for defendant (210 Fed. 26), and complainant appeals. Reversed in part.

This was the usual infringement suit, brought by the appellant, as plaintiff, based on two patents—one granted to Painter, No. 638,354, December 5, 1899 (application filed October 28, 1898), for a machine for automatically sealing bottles, and one granted to Painter & Hawkins, February 20, 1900, No. 643,973, for an apparatus for automatically supplying to the former machine the crowns which it attached to bottles. These crowns are shallow metal caps containing a thin cork disc, and the two machines, co-operating rapidly and automatically, place these discs upon the tops of and over the bottles, and then, under very heavy pressure, form the edges down over the top of the bottle neck and so make an air-tight closure. The District Court thought that neither patent was infringed, and dismissed the bill. The two patents are so distinct that they require separate consideration.

Painter's patent is designed to meet a problem presented by the fact that bottles, supposedly alike, are not precisely of the same height, and that, if such a machine is adjusted to give a pressure of (say) 700 pounds in seal-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing a bottle of the standard height, it will fail properly to close a bottle which is a trifle short, and it will crush a bottle which is a trifle high. The ac-

companying sketch shows his solution. The bottle was supported by a stand, which, with each revolution of the machine, was raised a certain distance by a supporting cam. The stand consisted of three telescoping members. The upper bottle-holding member is provided with a long rod carrying, at its bottom, a piston-shaped device adapted to enter the extreme bottom telescoping member or socket. Such entry, however, is normally prevented by locking dogs, which prevent telescoping and make the two members a unit in resisting pressure. An outer case serves as a third telescoping member, within which the bottle-supporting member passes downwardly whenever the bottom piston is permitted to enter the receiving socket. Within this case, and interposed below a shoulder on the upper member and above a sliding disc or horizontal portion, which normally is held rigid by the upper end of the locking dogs, but which may descend when these dogs are unlocked at the lower end, there is interposed a spring, known as the "spring under predetermined compression" (which we shall call the "upper spring"). It will be seen from the accompanying sketch that this horizontal disc or diaphragm which is the lower end

RELEASE MECHANISM OF PATENT No 638,354

of the part marked $e^5$, primarily receives and carries the entire thrust of the sealing operation, and does so through this upper spring; and it is evident that if this spring is set so that it will not be further compressed until it receives a pressure of more than (say) 700 pounds, all the parts named will at first be held in rigid, relative position, but that when this pressure is exceeded, and this spring yields very slightly, the dog-retaining piston, at the lower end of the rod, will descend correspondingly, the dogs will swing inwardly, the locking engagement will disappear, and, thereupon, if nothing further was provided, the entire upper part of the device, including the supporting stand and its rod, with the upper spring and the part $e^5$ and the dogs, would fall until stopped by the bottom of the receiving socket, and these parts would then have to be raised until the dogs could again spring into locking position to be ready for the next operation. To accomplish this resetting automatically, Painter provides a further spring, under suitable compression, but somewhat less than in the upper spring, and the bottom of the part, $e^5$, is supported in the casing by this resetting spring. The result is that, as soon as by the yielding of the upper spring the dogs have been unlocked, the entire thrust is transferred to the lower spring, which gives a yielding resistance thereto, and then, as soon as the pressure is relieved, sufficiently ele-

vates the upper parts and resets the device. The secondary resistance interposed by this spring to the thrust, thereby preventing the parts from being telescoped further than is necessary and avoiding a collapse, seems an important function, though it receives no mention in the specification.

Of the three claims sued upon under this patent, 4, 5, and 6, it is sufficient to quote claim 6, which is as follows:

"Claim 6.—In a pressure-limiting mechanism for bottle-sealing machines, a bottle-support, a compound cylinder, a spring between the two members thereof held under a predetermined compression, a tripping device for automatically releasing said predetermined compression, consisting of a pair of tripping-dogs pivoted to one member of said compound cylinder, and means carried by the other member of said compound cylinder for actuating the dogs, whereby said compound cylinder will become automatically shortened as a whole when the predetermined compression is reached and the pressure applied to the bottle resting thereon be automatically released, substantially as described."

Diagram Defendant's Machine.

The defendant uses the device shown by the accompanying diagram. It is sufficient to say that it has all the parts called for by the claim, accomplishing all the contemplated results, but that they are in such different form and arrangement, and reach their ultimate result under such variant conditions, that the question of infringement depends upon the breadth of equivalency allowed to the claims; and this necessarily brings us to the prior art.

The Painter patent in suit was not his first attempt to solve the problem. He had found another solution, by his patent No. 609,209, of August 16, 1898. This may fairly be called similar, in general construction and operation, to the patent in suit, excepting that the piston carried by the bottom of the rod was more truly a piston and rested upon a body of oil which filled the casing below that point. When the pressure overcame the resistance of the upper spring and the piston rod moved downward slightly, it opened ports in this piston and thereupon the piston would slowly descend as the pressure continued and as the liquid passed to the other side. The supposed breadth and scope of this invention are indicated by claim 1, which is as follows:

"Claim 1.—In combination in a bottle-sealing machine, a pressure-applying head, a table or rest for the bottle, means for moving one of said parts relatively to the other to obtain the desired pressure, and means for automatically limit-

ing the application of pressure when a predetermined degree is reached, ir-respective of the length of stroke of the movable part, substantially as described."

J. Q. Rice, of New York City, and R. H. Parkinson, of Chicago, Ill., for appellant.

C. P. Byrnes and G. H. Parmelee, both of Pittsburgh, Pa., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and EVANS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1] It is familiar knowledge that, either on account of the injury to the material handled or on account of the breakage of the machine on an unexpected resistance, it has been common in many arts to provide a pitman or plunger which would exert force rigidly up to a predetermined point, and, if the resistance was not overcome, would then yield. The record informs us that this method of treatment has been so common and the plan which is devised for one situation is often so adaptable to other situations that the Patent Office maintains, in its classification list and under the class "Machine Elements," a subclass known as "Pitman—Longitudinally Yieldable." Yielding resistance by hydraulic cylinder, or by air cylinder, or by springs, were different principles invoked in the different forms. The conception which lay at the bottom of plaintiff's 1898 patent, viz., that he could go to the yielding plunger art, or to some specific art, and adopt a yielding plunger as an element of a bottle-sealing machine, was a meritorious conception. It may have entitled him to a broad monopoly upon any use of a yielding plunger in that association (as was apparently secured to him by the first claim of his 1898 patent). That question is not before us, and we do not mean to intimate any opinion; but, however that may be, having had this conception in 1898 and having received a patent, he could not have another patent in 1899 which would do more than cover the improvement which he then discovered. Having gone into the yielding plunger art, and adopted and adapted the hydraulic cylinder yielding plunger into and for a bottle-sealing machine, and having thus bridged over whatever gap there was between bottle-sealing machines and yielding plungers, and having thus incorporated the two arts together, he could not the next year adapt a mechanical trip-yielding plunger to bottle-sealing machine use and then get a valid patent covering any kind of a mechanical trip-yielding plunger when used in a bottle-sealing machine. Yet this is, in effect, his present position, and must be his position to succeed. There remained open for his 1899 patent only his adaptation, not his adoption. Judge Killits happily expressed this thought in his opinion below, when he said:

"But, when Painter patented the mechanism alleged to be infringed in this case, the art of bottle-sealing by crowns had already invaded the art of yielding pitman, of which the known forms were many, and had made an appro-

217 F.—25

priation therefrom. Whatever may be the merits of his invention, we find nothing in his grant which shuts the door of opportunity to some other inventor to go to the yielding plunger art for an old device of this character."

[2] Defendant's structure is, speaking broadly, a reproduction of the pressure relief mechanism or yielding plunger which was shown by the now expired patent, to Penfield, April 22, 1890, No. 426,315, as part of a brick machine. The parts in defendant's device are the same in number, form, shape, and arrangement as in Penfield (with the exception of the resetting spring hereafter mentioned). The Penfield structure was probably intended to prevent breaking the machine, which was of great weight and strength, when there was a large stone in the brick mold; and to adapt this machine to handling glass bottles required changes in details and very nice machining and adjustment. Whether these changes and this adaptation involved invention, and entitled the defendant to a patent, is a question not involved, except somewhat collaterally. It has no direct bearing on the inquiry whether the patent in suit is entitled to a sufficiently broad construction to include the defendant's form. It is sufficient to say that, for the reasons we have stated, Painter's second patent, which, to be valid, must be confined to the general type of resisting spring and mechanical trip which he shows, cannot cover another type of yielding plunger, the different typical character of which is demonstrated by its development from the older art, instead of from Painter's patented improvement.

[3] Another feature with reference to this patent requires attention. So far as the record informs us, the lower spring, having the double function of furnishing secondary resistance and resetting the device, was quite new in this association, and it seems to give distinct and meritorious character to Painter's device, above and beyond the credit due him for devising an efficient form of mechanical trip. Apparently, he would have been entitled to a patent securing to him the use of this double function spring in combination with any suitable form and arrangement of the other elements. In this aspect of the invention, it has been appropriated by defendant, who was apparently compelled to add Painter's resetting spring to the Penfield brick machine in order to make it satisfactory for the desired purpose. This feature of the case leaves us dissatisfied with a conclusion of noninfringement, if any reasonable construction of the claim permits the inclusion of this resetting spring as a characterizing element; but we are convinced that such construction cannot be given without doing violence to settled rules. Only when necessary to make the claims operative, or in case of ambiguity apparent on the face of the claims, or induced by their study in connection with the specification and prior art, is a court permitted to read in an element not expressly named therein, in order to narrow a claim, so as to make valid one otherwise invalid. McCarty v. Lehigh Co., 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358. This court has applied this rule, and has refused thus to narrow a claim, and confine it to what turned out to be the real invention, in many cases (see National Co. v. Gratigny, 213 Fed. 463, 467 130 C. C. A. 109); and we have, for that purpose, limited a claim beyond its apparent

scope only in cases like Lamb Co. v. Lamb Co., 120 Fed. 267, 269, 56 C. C. A. 547, when it contained some general term of reference which was capable of being so narrowed by interpretation without importing an element distinctly foreign.

In the Painter patent in suit we can find no room for a suggestion of inoperativeness or uncertainty which would justify such interpretative treatment. All the 12 other claims of the patent, not selected for this suit, refer to the machine as a whole. One of them expressly includes this secondary or lighter spring as an element, and others contain phrases which might be construed as referring to that spring; but each of these 12 claims is, in other respects, so limited that, very likely, plaintiff was well advised in not bringing suit upon them. In distinction from the other 12, each of the 3 claims sued upon is confined to the "pressure-limiting mechanism" of the machine, and directed only to the pressure-limiting function, apparently with the distinct purpose that these claims might be broad enough to cover Painter's pressure limiting mechanism, no matter in what general association it was put. The "pressure-limiting function" is finished before this secondary spring begins to operate, and to read the secondary spring into these claims would be to say that a pressure-limiting mechanism, described as consisting of certain parts, included a part which was not named and which had no share in limiting the pressure. This is an impossible conclusion. If this suit were directed against a device which had no such secondary spring, but in which the telescoping cylinders completely collapsed when the dogs were tripped, and in which the table must, each time, be manually raised and reset, we would be compelled to find that infringement of these three claims was not avoided by the omission of this resetting spring. It is not improbable that the patentee and his solicitor regarded this secondary spring as of importance only where there was a series of sealing machines working in very rapid succession, as shown in the specification and as specified in the only claim which names the resetting spring, and that the patentee purposely drafted these three claims so that they would be broad enough to cover a slower device which should be reset by hand. To narrow them now by a limitation which the patentee refused to have would be to trifle with the patent contract. So far as the decree below finds noninfringement of the Painter patent, it must be affirmed.

[4] The other patent in suit concerns a more complicated structure. The crowns come to the sealing machine in a confused mass and are poured into a hopper. Before these can be fed to the sealing mechanism through a suitable chute, it is necessary that they be arranged so that each will be presented in exactly the same position at the receiving end of the chute, and especially that they must all be the same side up. It was common to put buttons or rivets, in a mass, in a hopper, and, in connection with agitating them, assort and select and present them, so that they would pass through a suitably shaped delivery chute. In a broad sense, this was the same operation desired for crowns for bottles; but the record is convincing that the peculiar character of these crowns so far required special treatment as to leave

abundant room for invention in adapting to their manipulation the general features of construction used for handling buttons and riv-

*Fig. 1.*

ets. The constructions involved are shown by the accompanying cuts. The single claim in suit, No. 2, is given in the margin.[1] Referring to this claim and the drawing of the patent, the hopper and its inclined bottom are apparent; the external chamber of the claim is marked $E$. In the form shown, it is a short cylinder with horizontal axis, which cylinder is a part of the frame or body of the structure, and carries, centrally, a suitable box or hub for a revolving shaft. Carried by and rotating on this shaft is what the claim calls a "receptacle or cage." The further or outer side of this cage is closed by a dome-shaped cap, $k$. The side adjoining the hopper (or, more accurately, adjoining the external chamber, $E$, here considered as part of the hopper) has a central opening surrounding the rotating shaft, and through which the closures may pass from the chamber, $E$, into the rotating cage. By reason of the inclined bottom of the hopper and the comparatively separated chamber, $E$, it follows that the crowns are not presented to the selecting mechanism in a large mass, or pressed by the weight of those in the hopper, but that comparatively few continually come down and fall over against the rotating side of the cage. This is provided with lifters or wings, which pick up the crowns from the bottom of the chamber, $E$, and carry them up to a higher position, from which they slide through the opening in the side of the cage into its interior. Here the comparatively few which enter at a time are tumbled, and in the periphery of the tumbling cage are passages or openings such that, whenever a crown is presented in

[1] "Claim 2.—In an automatic feeding apparatus for bottle-sealing machines, a hopper for the indiscriminate reception of the crowns or closures, a chamber external to said hopper, an inclined bottom to said hopper adapted to leading the closures to said external chamber, and a receptacle or cage rotating within said external chamber, having one side closed and a central opening in the side adjoining said hopper, adapted to receive the crowns or closures indiscriminately from the hopper, and containing in its periphery suitably-formed passages such that the crowns or closures can pass therethrough in one position only, whereby, by the tumbling action of said cage, the crowns or closures are changed in position therein until they present themselves in proper position to pass through said passages to a surrounding channelway, substantially as described."

proper position, it will fall out of the cage through the opening or passage and into the surrounding channel which leads to the delivery chute. The defendant's device is generally similar, but different in some respects. It clearly has the hopper, and there is an inclined hopper bottom and a rotating receptacle or cage, which, on the side away from the hopper, is more or less completely closed, which has an opening on the side toward the hopper, and which contains, away from its center and towards its periphery, passages suitable for receiving the crowns in one position only and for leading them to a surrounding channelway. Crowns in limited quantity fall from the hopper up against the interior surface of the rotating cage, when it is in the position shown. They are then impelled by inclined wings on the cage to fall through into the interior of the cage, where they are tumbled until they go out through the passageways. The distinctions which are claimed to be vital and to avoid the charge of infringement, when the claim is construed so as to save its validity, are  three. It is said that the device does not contain the "external chamber" of the claim, that the rotating cage is not closed upon one side, and that the rotating cage does not have a central opening in the opposite side. As collateral to the lack of the external chamber, it would follow that there could be no inclined hopper bottom adapted to lead the crowns to the external chamber, and there could be no cage rotating within such chamber.

As to the first subject-matter, it is said that defendant's device is all one unitary hopper leading down to and against the interior surface of the rotating cage, and that the inclined part, marked "2," at the bottom of the upper wider portion, is only an agitator operated by cam 4, preventing the crowns from arching at the hopper opening and delivering them down more slowly to the bottom of the hopper. We think it not very material to decide whether this plate 2 is or is not the "inclined hopper bottom" of the claim. The external chamber of the claim is not defined therein. So far as the terms of the claim go, the chamber may be directly below the hopper as well as at the side; and it is no distortion of the ordinary meaning of the words used to assume that plate 2 or plates 2 and 6 constitute the hopper bottom, and that everything below that point is an external chamber. We get the same result, however, if we assume that plate 16 is the inclined hopper bottom. Even then, all of chamber 3 which is above the extreme bottom and below the partition 6, and which is at the left of an unde-

fined line connecting the external bottom point of *16* to some point in partition *6*, responds to the general idea of such external chamber. It is a chamber, and it is external to the main part of the hopper structure—that part which is permitted to operate as a hopper. If the phrase "external chamber" is treated as meaning merely a suitable passageway which will receive from the inclined hopper bottom a limited number of crowns and permit them, as they accumulate, to lie over against the face of the rotating cage, so that they will there constitute only a shallow pile (and this construction does no violence to the words used), then the defendant employs this feature.

As to the next point, it is quite fair to say that the defendant's rotating cage is closed on the side away from the hopper. There are openings, not clearly shown in the drawing, such that this side could not be called closed for all purposes; but, as used in this connection, the word merely contrasts with the open condition on the other side. "Open" and "closed" mean "open" so that the crowns will fall in, and "closed" so that they will not fall out, and with this natural and reasonable interpretation this side of the defendant's cage is closed. The fact that the closing plate does not usually rotate with the cage is not important.

The contention that the opening on the hopper side of the rotating cage is not central of the cage is not tenable. True, the exact center on this side of the cage is closed by the shaft and its box, and the opening is an annular one surrounding this box or shaft hub; but exactly the same thing is true of the patent in suit, and, in both cases, this opening is relatively central with reference to the extreme diameter of the cage.

[5] It being thus apparent that, upon a fair and natural construction of the claim language, there is infringement, the inquiry must be whether the state of the art or the Patent Office proceedings import into the language such limitations as to require the contrary result. Our study of earlier patents, as proved in this case, shows no anticipation (indeed, no complete anticipation is claimed); and we find nothing justifying any further claim limitations than were required during the progress of the application through the Patent Office; and so we come to the question, as the really vital one in the case, what the effect was of the various rejections and amendments. On this question it is as important not to exaggerate as it is not to minimize. Where there has been a rejection, followed by an amendment, it is natural to think of the net result as a limitation; but it may be or may not be. Not infrequently it is a mere expedient for overcoming the examiner's unfounded objection, or it only makes more clear to him the real meaning of the claim as it already existed, or, if a limitation, it is in some particular which is wholly without effect as to the point involved in the subsequent litigation where the proceedings are under examination; indeed, sometimes, the amendment is, in that particular, if not generally, a distinct broadening of the claim. The exact thing done must be examined from all sides, and especially in connection with the point later in controversy, before its effect can be interpreted. We therefore approach the study of the Patent Office proceedings from this point of view: Assuming that the claim lan-

guage, with reference to what is said to be the missing or the variant element, might otherwise properly be thought to read upon defendant's structure, did the applicant, before the grant of the patent, acquiesce in a construction which, as to this particular feature, is more limited? If so, the patentee is bound by that limited construction; otherwise, not.

First, as to the external chamber: Did anything occur by which the applicant agreed to a definition of this chamber as one on the side of the lower part of the hopper and with a clear and absolute line of demarcation between the two, rather than as merely a suitable passageway leading from the inclined hopper bottom and presenting at its further edge only the bottom of a sloping pile of crowns? The claims which involve this external chamber appeared in the original application as 1 and 2. One of them named this part as "a passage for supplying the crowns from the hopper to the cage" and the other named it as "an auxiliary chamber adapted to receiving the crowns from the hopper." These claims were rejected on reference to patents to Muslar, Gillette, and Bennett. Thereupon applicant canceled these claims and substituted four others, each of which contained, in some form, as an element, this external chamber, but in no one was there any restriction upon its location, size or shape. Neither did any one of the four claims carry any restriction upon the form or construction of the rotating, selecting cage, excepting that it rotated in the external chamber and was provided with exit passages. The rejection was repeated upon the same references. These claims were canceled, and two new claims were submitted. Each of these included a reference to "a chamber external to the hopper." These were again rejected. The applicant asked an explanation of the rejection, and the examiner pointed out that:

"Bennett discloses a hopper and chamber external to the hopper, an inclined bottom to the hopper for feeding to the external chamber and a selecting cage in the external chamber, an exterior portion of the cage forming part of the front wall of the chamber."

To this statement applicant responded with an argument pointing out the distinctions between his device and Bennett's. He insisted that Bennett had no selecting cage, in applicant's use of the phrase, and had only a notched disc which picked up buttons directly from the mass in the bottom of the hopper, and pointed out that in both the references the articles did not pass into a selecting cage to be tumbled, and said:

"In applicant's case, they pass in a mass into the interior of what is truly termed a rotating cage, and they are selected by passing through the pockets from the inside outward. This construction is the gist of applicant's invention, which enables it to successfully select and fit the crowns. * * * Thus neither Bennett nor Gillett really use a selecting cage. * * * The claims now presented have also the element of a rotating selecting cage, having one side closed and the other open."

Accompanying this argument was the claim now in suit, and it was thereupon allowed. It differed from and was more limited than the claims which had been rejected, not at all with reference to the external chamber, which was claimed in the same general language which

had been continually used, but in the provision that the rotating cage should have one side closed and should have a central opening in the opposite side, and that it should be adapted to receive crowns indiscriminately from the hopper, and that it should have in its periphery suitably formed selective openings.

This history demonstrates that no limitation upon the form or location of the element, which was sometimes called an external chamber and was sometimes called an intermediate passage, was, at any time, put upon the claim as the result of any rejection. The patent to Bennett is not included in the record. We must, therefore, take at their face value statements regarding it made by the application record. The two other patents cited, Muslar and Gillett, disclose nothing corresponding to the external chamber. However, since it was said to be contained in Bennett, and this was not denied by applicant, we must assume that it was. It follows that there is no patentable novelty in this external chamber alone, considered as a passageway which would present crowns to selecting mechanism in such a way as to prevent clogging; and the same conclusion would seem to follow as to the hopper with inclined bottom in connection with the external chamber or passageway; but it does not follow that there could be no invention in combining these two elements with a new form of a selecting cage adapted to receive and tumble and select the closures fed through the hopper and intermediate chamber.

When we trace the rotating cage through the history of the claim amendments, we find that it was at first named broadly as merely a rotary, selecting cage. Then, in the four claims, it was limited to a selecting cage rotating within the external chamber and containing exit passages. After these claims were rejected, the two next presented tendered a less limited description of the selecting cage, providing only that it should form one wall of the external chamber, but without any limitation upon its interior shape, construction, or operation. Then, when the Office pointed out that Bennett was thought to have a rotating cage responding to these two broadened claims, applicant presented the argument already quoted, insisting that the Bennett device had no rotating, selecting cage in the sense in which the claim used the term, and for greater certainty and better distinction pointing out that the rotating cage, which was to be an element of the combination in the patent being solicited, should be centrally open at one side, so that crowns could pass in a mass into its interior and be there tumbled, being kept in by the closed opposite side of the cage and being allowed exit only through suitable peripheral passages. The examiner, representing the government, acquiesced in this view, and a patent issued. Certainly there is, in this course of conduct, nothing limiting the claim to that form of central opening in one side of the cage or to that form of closing the opposite side of the cage which the drawings show. The proceeding, as a whole, shows that applicant in the end insisted that it was new to combine in one structure the hopper with the inclined bottom, the external chamber or intermediate passage leading from the inclined bottom to the selecting cage, and a rotating, selecting cage which had an interior cavity where a comparatively small number of

the articles would be tumbled, which would receive these articles through a central side opening, which was closed upon the other side and which had suitable exit openings, and shows that the Patent Office yielded to this insistence and issued the patent; and we can find nothing tending to limit the claim in any particular which will serve to distinguish the defendant's device. No one had before combined such a hopper and such a passageway with such a selecting tumbler cage. The combination successfully met the peculiar difficulties of handling this material; and even though there might have been no invention in selecting and combining these three elements, if all had been old, yet there was sufficient novelty in this cage itself, so that a patent for the combination of this cage with the other two elements necessary to make it satisfactorily do this work, although the other elements were old, was a valid patent.

It is not fully accurate to say that the selecting cage of the patent rotates "in the external chamber," and this descriptive phrase must be read with reference to the actual structure to which it refers. As the claims are worded in some of the amendments, this rotating cage forms one side of the external chamber. It is not wholly wrong to say that a rotating disc, which forms one side of the chamber, and so is one part of the chamber, rotates in the chamber. The function of the patent consisted in so relating the chamber and the cage that the crowns were passed slowly into the cage, so that it would contain only a few at a time. This was new, and we are not inclined to give the word "in" its most precise meaning; but even if we should, and should say, as defendant argues, that the cage of the patent rotates "in the external chamber" only by means of its vanes or lifters, which project into the chamber so as to contact with the crowns which lie at its extreme edge, and, therefore, that defendant's cage must be found to project into the chamber in the same way, it would not alter the result. Defendant also has vanes or wings projecting beyond the chamber surface of the cage, and so projecting and rotating in the chamber. The projection is slight, but it is sufficient to reach and affect the adjacent crowns. They are not lifted up and carried over, just as in the patent in suit, but they are pushed along, or agitated, and caused to fall over, with practically the same result.

Construed as we think the claim should be, no one of the distinctions between it and defendant's structure is material, and there should be the usual decree for injunction and accounting. In this particular, the decree below is reversed, and, for that purpose, the case is remanded, with costs.