FEATHEREDGE RUBBER CO. v. MILLER RUBBER CO. et al.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1919.)

No. 3178.

1. PATENTS ⊗═328—INFRINGEMENT—DISCLOSURE.
    The Willis and Felix patent, No. 1,045,234, for a process for rubber sponges, *held* invalid; the disclosure of the patent not being sufficient to enable one skilled in the art to manufacture sponges with commercial success.

2. PATENTS ⊗═116—DISCLOSURE—SUFFICIENCY.
    While no hard and fast formula need be given and experimentation may be necessary to get the best results, the disclosure in a process patent must be sufficient to enable those ordinarily skilled in the art to produce the substantial result desired.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John M. Killits, Judge.

Suit by the Featheredge Rubber Company against the Miller Rubber Company and others. From a decree for defendants (250 Fed. 255), complainant appeals. Affirmed.

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Frank T. Brown, of Chicago, Ill., for appellant.

Wm. F. Hall and Melville Church, both of Washington, D. C., for appellees.

Before WARRINGTON and DENISON, Circuit Judges, and COCHRAN, District Judge.

DENISON, Circuit Judge. A patent infringement bill, in the usual form, was dismissed by the court below on final hearing because the patent was thought invalid for the reason that it did not sufficiently disclose the true invention. The patent is No. 1,045,234, issued to Willis and Felix, November 26, 1912, upon an application filed February 4, 1907, and is for a "process for making artificial sponges." The title to the patent had duly passed to the Featheredge Rubber Company, the plaintiff below.

The case rests upon the distinction between sponge rubber and rubber sponge. Sponge rubber is an old and well-known product, and indicates merely rubber which, when vulcanized in mass form, is in considerable degree soft and resilient. The curing or vulcanization of rubber is brought about by subjecting it to a high degree of heat after it has been mixed with sulphur, and perhaps other ingredients, whereby a distinct change in the character of the raw material results. In making sponge rubber, and under the influence of the heat, minute particles of matter which have been disseminated throughout the raw compound gasify, and a minute hollow globular cell is formed from each. The material is rigidly held in a mold of the desired form, and thereby expansion, to any great degree, is prevented. In the typical sponge rubber, these cells are very small. They maintain their formation, and the rubber becomes slightly soft. In the characteristic rubber sponge, this process of interior expansion is carried much further. There is thoroughly mixed with the mass of raw material a suitable quantity of a certain element adapted for thus gasifying and expanding, called the "blowing agent." Water may be used for that purpose or bicarbonate of soda, among many other things. The interior expansion continues until the globular cells are, for example, the size of a pea, and the walls of rubber separating the cells have been stretched so as to be thin and relatively fragile; they are in that form when curing finally takes effect, and each partition becomes a very thin sheet of soft vulcanized rubber. Obviously as soon as the external heat is discontinued, the interior heat will diminish, the interior gases will (or may) partially condense, and each cell, and therefore the whole body, will tend to collapse. These interior cellular walls are then partially broken down or ruptured; the preferred method being by running the mass through a wringer, which compresses what gas remains in each cell to the point of bursting through its walls. When this is accomplished throughout the mass, the air will enter and fill each cell, and the mass will expand approximately to the size it had at the effective moment of vulcanization. If, then, this mass is compressed, as by the hand, expelling the air, and allowed to expand again under water, the water will fill the interior cells, and much of it will be held there until it is squeezed out. This result is called a rubber sponge, because it is

approximately equivalent to the natural sponge, and is sold for many of the purposes for which the natural sponge has been used.

While, in one sense, the rubber sponge is a mere development of sponge rubber, it must be conceded that they are, commercially and practically, different articles, although the precise dividing line may be difficult to fix. That dividing line is not important, in this case, since the product of both parties is far removed from it. Prior to 1903, rubber sponges were not known in this country, save as importations from Russia. The manufacturers of rubber articles in this country either had not known how to make sponges or had not cared to. With the exception of the matters to be mentioned, the patentees were the earliest to make, in this country, and put upon the market, a practical and successful rubber sponge, and they must be given the chief credit for the successful founding of a new branch of the rubber goods industry.

[1, 2] It had been common to practice vulcanization through steam heat in two methods. The first was to confine the rubber article in a metallic mold and apply the steam heat to the outside of this mold. The second was to expose the rubber article, uncovered, in a tight steam chamber and thereby get a direct application of the steam heat. Sponge rubber had been made in these molds, but it was the theory of the patentees that the molds prevented sufficient expansion to make a good rubber sponge. At the same time they recognized there must be an external pressure upon the rubber to prevent too much internal expansion, and they observed that the direct pressure of the steam upon the outside of the mass of rubber would take the place of the metallic mold and would prevent expansion beyond the point of balance. They made this observation or discovery the basis of their patent; and they reduced the idea to form in several claims, of which No. 3, quoted in the margin is typical.[1] While this claim and the other claims in suit include other features in their stated combinations, it is practically conceded that earlier patents and publications which need not be mentioned show the same combinations, unless it be for this restraining effect of the direct action of the steam in the open steam vulcanizer, and the validity of the patent can be upheld only by dependence upon this feature as being novel in this combination and as thus imparting novelty to the combination.

Several defenses are urged, which have at least plausible force. If all the others could be overcome, there would remain the one upon which the court below chiefly relied, and which can best be appreciated after observing the alleged anticipation by the B. F. Goodrich

---

[1] Claim 3: The herein-described process of making artificial sponge, which consists in curing a compound of rubber and a material adapted to assume gaseous form on the application of heat, by subjecting the compound to the direct action of steam under pressure sufficient to prevent the escape of the gases generated during the curing operation, whereby the resulting product becomes a cellular structure composed uniformly throughout of contiguous thin-walled closed cells, and after permitting the cooling and contraction of the resulting substance, mechanically breaking down the walls of the contiguous cells formed during the curing operation by thoroughly tearing or slitting them whereby complete intercommunication between contiguous cells is secured, and the resulting material is rendered capable of the ready absorption of liquids.

Company, of Akron, Ohio. Prior to 1903, the Goodrich Company had sent its president to Russia for the express purpose, among others, of learning how to make the Russian rubber sponge. He acquired this information, or thought he did, and in 1902 and 1903 he proceeded to put it into effect at the company's factory. Sample rubber sponges were produced and given to salesmen. The article was fully described in the regular printed circulars of the company, and a very considerable number of sales were made in all parts of the country. These were followed by some shipments. During 1903 the Goodrich Company un-. doubtedly produced, sold, and shipped a very substantial number of sponges, practically the same as those later produced by the patentees; but after advertising the article, and offering it for sale for several months, or perhaps a year, the Goodrich Company withdrew its offer and discontinued the manufacture. The testimony in this case puts beyond fair doubt that the Goodrich Company, in this work, used precisely the process described and claimed in the patent in suit, and there would be obvious and complete anticipation save for the effect of that company's discontinuing the business. This is said to transform the whole thing into an abandoned experiment whereby it may not serve as an anticipation; and it is also urged that, in so far as the Goodrich Company used the critical step in the patented process, they did it accidentally and unintelligently, and that they abandoned the effort because they did not understand the underlying theory upon which the patent in suit depends.

Since it had long been common to cure all kinds of rubber articles by exposure to direct steam action, and since a temperature of about 300 degrees Fahrenheit was known to be the appropriate heat for giving the characteristics desired in a rubber sponge, and since the relation between temperature and pressure was invariable, and 300 degrees Fahrenheit, in an open steam vulcanizer, meant, everywhere and always, about 60 pounds pressure, and this was as elementary and obvious then as now, we are not able to believe that the experts of the Goodrich Company did not then understand the tendency of the enveloping steam to have the effect of a restraining mold just as well as they did after reading this specification. They gave up the business because, though they could and did make good sponges, the percentage of failure was too great. This result—some failure and some success— could not come from a neglect to get the appropriate steam pressure, because, if they had the right heat, they must have had the right pressure, and it is not to be supposed that they would have been careless and nonobservant as to their temperatures.

We are convinced that the real reason for their partial failure must have been that they did not sufficiently understand the necessary composition of the rubber compound to be used. This leads us to observe that the specification of the patent in suit gives no precise information upon this point. It is the theory of the patent, and the specification distinctly states, that the user of the process may take any raw rubber compound, which he may buy upon the market, and incorporate with it any blowing agent commonly used for producing internal expansion, and thereupon treat this material by the patented pro-

cess. If this language is taken at its face, and if there was among the rubber compounds then on the market any one which, treated with some selected one of the blowing agents then known and in use, would fail, the specification would seem to be deceptive and insufficient; and plaintiff's counsel concede that, if this test is applied, the patent must fail. For the purposes of this opinion, however, we accept their contention that the patent will be valid if the person then ordinarily skilled in the art could, by reason of his skill, select an appropriate compound and blowing agent from those on the market, and, as the result of this selection, could successfully practice the patented process.

Even this liberality of rule will not save the patent. The proof to this effect is entirely convincing. We notice only two facts, out of the many in proof, which tend to this result. One is that an expert selected by plaintiff, and fully taught by the patent and aided by consultation with plaintiff's factory experts, selected and purchased compounds which were upon the market in 1907, and added blowing agents according to his judgment, and, in a considerable number of tests, entirely failed to make anything which could be defined as a rubber sponge, under the definition which plaintiff must adopt in order to support its theory of invention. From these tests, he got only a fair or good sponge rubber. The other is that plaintiff uses, and defendant uses, and this expert, when he finally succeeded in making good sponges, used, a peculiar and special ingredient ("paragol," a corn oil substitute) in the compound, which ingredient serves as a blowing agent, and probably also has other qualities, and which ingredient, as entering into this compound, was early discovered by and has always been used by plaintiff, but was kept secret until defendant learned about it and began to use it to make successful sponges in competition. No one, seemingly, has ever made a satisfactory sponge without using "paragol," or its equivalent, in addition to the specific blowing agent, and it does not appear that compounds containing this ingredient, or an equivalent, in proportions suitable for the uses now involved, were upon the market, or, indeed, known to any one, in 1907.

We do not overlook the formula given in the Lefferts patent of 1902, nor the reference to corn oil substitute in the text book of 1899. Paragol is not indicated in the Lefferts patent, save by the very generic name "rubber substitute," of which there were scores; nor was the Lefferts compound intended for any use comparaable to that of these patentees, nor did Lefferts give any proportions. The text-book does not indicate that corn oil substitutes had any of the peculiar qualities which now seem to make paragol, or something like it, essential to the rubber sponge. We think there is no reasonable escape from the conclusion that the patentees' real discovery was not in what they disclosed in their specification, but in what they concealed, and that their purpose was to get the protection of a patent, and, at the same time, hold back the knowledge which would allow the public to manufacture successfully at the end of the patent term. The testimony of one of the patentees is directly to this effect, but he is now interested adversely to the plaintiff, and we do not find it necessary to place dependence on that testimony.

It is not important that no hard and fast formula is given, nor that considerable skill and experimentation may be necessary to get the best results. Minerals, etc., v. Hyde, 242 U. S. 261, 37 Sup. Ct. 82, 61 L. Ed. 286. The trouble here is that those ordinarily skilled could not practice the invention with even a tolerable degree of success, unless after a series of blind experimentation, which might happen to give the necessary information, but might not. If intelligible and fairly specific directions had been given as to the qualities the compound must have, plaintiffs' case would have a better aspect; but this was not done. We find specified only the four qualities desired in the final product, and not only are these qualities not substantially present in any compound that any one has used, but they are all ascribed to the patented treatment. To say, as is said by implication, if at all, that the raw material must have those inherent qualities which are necessary to make the patented process work successfully, and to stop there, is to add nothing to the reader's previous knowledge.

From our conclusion of fact as to lack of disclosure, the invalidity of the patent necessarily follows. Sewall v. Jones, 91 U. S. 171, 23 L. Ed. 275; Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860.

The decree of the court below is affirmed.