SUN RAY GAS CORPORATION et al. v. BEL-
LOWS–CLAUDE NEON CO. et al.

No. 5644.

Circuit Court of Appeals, Sixth Circuit.

May 12, 1931.

Kwis, Hudson & Kent, Lloyd L. Evans,
and A. J. Hudson, all of Cleveland, Ohio, and
George F. Scull, of New York City, for ap-
pellants.

Harold Elno Smith, of Cleveland, Ohio,
and William Bohleber, of New York City
(Smith & Freeman, of Cleveland, Ohio, and
Francis H. Fassett, of Dayton, Ohio, on the
brief), for appellees.

Before DENISON, HICKS, and HICK-
ENLOOPER, Circuit Judges.

HICKENLOOPER, Circuit Judge.

Appellants urge the invalidity of claim 1
of patent No. 1,125,476, for a "system of illu-
minating by luminescent [neon] tubes" (is-
sued January 19, 1915, upon application of
Georges Claude), upon the ground of insuf-
ficient disclosure in the specification upon the
allegedly essential and all-important subject
of pressure; and because the claim, printed
in the margin,[1] has used what is said to be a
meaningless ratio as descriptive of the size of
the electrodes. It is also claimed that the ap-
pellants' tubes do not infringe, in that elec-
trodes of the cap type are used, and these are
said not to be "internal electrodes" nor to
have been specifically "deprived of occluded
gases," and because the neon is said not to be
"previously purified." We shall consider
first the contention of noninfringement.

It is true that Claude disclosed in his
specification a method of purifying the neon
gas "on the spot," or when and as the tube
was exhausted and then partially filled (to
less than atomspheric pressure) with said gas,
and that defendants do not use that method
for securing a practically pure neon content
for their tubes. But this method of purifica-
tion was not, we think, of the essence of
Claude's invention. He was vitally interested
in securing a pure neon content, and to this
end it was probably necessary that he de-
scribe a method by which this could be accom-
plished. He has described such a method.
At that time neon gas was just coming into
commercial production, as a by-product of
the liquification of air, and the various pump-
ing apparatus for producing vacuum were
much less efficient than they are today. A

[1] "1. A luminescent tube containing previously pur-
ified neon and provided with internal electrodes for
illuminating said gas, said electrodes being deprived
of occluded gases and having an area exceeding
1.5 square decimeters per ampere, to decrease the
vaporization of the electrodes and prevent the con-
sequent formation upon the walls of the tube, in
proximity to said electrodes, of deposits containing
said gas, whereby the luminosity of the tube is main-
tained constant for a very considerable period of
time without a fresh introduction of gas."

practically complete vacuum can now be produced, and a substantially pure commercial neon can then be admitted to the tube, thus dispensing with the necessity of Claude's scavenging process. We feel constrained to construe the words "containing previously purified neon" as descriptive only of the state or degree of purity of the neon gas after introduction into the tube and when such tube is ready for operation. In other words, the claim calls for the tube after complete construction and as ready for operation, and one descriptive element is a content of a substantially pure neon.

Viewed in the above light, the phrase "said electrodes being deprived of occluded gases" also operates to the same general end, although it is directed not so much to the initial purity of the neon as to the provision for a continuance of that purity and an avoidance of contamination through the subsequent release of occluded gases. Neither of the clauses above discussed may be regarded as requiring more than that, when completed, the tube shall contain, and shall continue to contain during operation, a substantially and operatively pure neon. It is therefore immaterial that the defendant does not use the methods disclosed by Claude for purifying its neon or for removing the occluded gases from the tube and electrodes.

We are also of the opinion that the defendants' electrodes are within the call of the claim for "internal electrodes." It may well be that the cap electrodes are an improvement upon the cylindrical type, open at opposing ends, and that the fact that there were, or might be, more useful designs and shapes for the electrodes than the cylindrical and plate types then in common use, may not have occurred to the mind of Claude, but we think that he intended to distinguish only between those electrodes (of carbon, graphite, or metal) which came into immediate contact with the gas, and which were directly connected with conductors for the electric current, and electrodes which were external to the tube, did not contact with the gas, and operated by induction. It is obvious that the defendant's cap electrodes fall within the former and not the latter of the two types.

■ A somewhat more difficult question is presented by the contention that the disclosure upon the subjects of pressure and volume of the neon is wholly insufficient to enable one, even though as of that time to be considered skilled in the art, to practice the invention; and that, except as regards certain pressures, the ratio of at least 1.5 square decimeters of electrode surface per ampere is wholly meaningless. Both contentions are based upon the provisions of Rev. St. § 4888 (35 U. S. C. § 33 [35 USCA § 33]), that the specification shall contain "a written description of the (invention) * * * in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and, use the same; * * * and he [the applicant or patentee] shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Definiteness is expressly required both in the description and the claims. But by the terms of the act also the specification is addressed to those "skilled in the art," and a specification should be held sufficient if a mechanic skilled in such art, with the specification and drawings before him, and without the necessity of further experiment itself of an inventive nature, can construct and practice the invention of the patent. O'Reilly v. Morse, 15 How. 62, 118, 119, 14 L. Ed. 601; Tyler v. Boston, 7 Wall. 327, 330, 19 L. Ed. 93; Loom Co. v. Higgins, 105 U. S. 580, 585, 26 L. Ed. 1177; The Incandescent Lamp Patent, 159 U. S. 465, 474, 475, 16 S. Ct. 75, 40 L. Ed. 221; Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 271, 37 S. Ct. 82, 61 L. Ed. 286; Beidler v. U. S., 253 U. S. 447, 453, 40 S. Ct. 564, 64 L. Ed. 1006; Eibel Co. v. Paper Co., 261 U. S. 45, 66, 43 S. Ct. 322, 67 L. Ed. 523; American Lava Co. v. Steward, 155 F. 731, 736 (C. C. A. 6), affirmed 215 U. S. 161, 30 S. Ct. 46, 54 L. Ed. 139; and Featheredge Rubber Co. v. Miller Rubber Co., 259 F. 565, 570 (C. C. A. 6), are a few of the many authorities establishing the rule of decision in such cases.

■ In some of the above authorities the claims were held void for vagueness or insufficiency of the description; in others the description was held adequate. The difficulty is not with the rule, but with its application, and in applying it due regard must be given to the collateral principles that the claims measure the invention (Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 510, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; Paper Bag Patent Case, 210 U. S. 405, 419, 28 S. Ct. 748, 52 L. Ed. 1122; McClain v. Ortmayer, 141 U. S. 419, 424, 12 S. Ct. 76, 35 L. Ed. 800), that such claims should be liberally construed so as to uphold and not destroy the right of the inventor, especially in the

case of a generic invention (Temco Co. v. Apco Co., 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. 298), and that a claim is not invalidated by the omission of that which is immaterial, well known, described in the specification, or easily supplied by one skilled in the particular art. That which is, and was understood to be, necessary to make the claim operative may then be implied therein, provided always that the description of the claim and specification is sufficient to meet the requirements of the phase of the rule first above discussed. Cf. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 558, 18 S. Ct. 707, 42 L. Ed. 1136; Deering v. Winona Harvester Works, 155 U. S. 286, 302, 15 S. Ct. 118, 39 L. Ed. 153; Loom Co. v. Higgins, supra; Jones v. Evans, 215 F. 586 (C. C. A. 7); Crown Cork & Seal Co. v. Sterling Cork & Seal Co., 217 F. 381 (C. C. A. 6). In each such case one must seek to determine, primarily, just what it was that the inventor conceived and sought to describe and patent (cf. Mossberg v. Nutter, 135 F. 95, 99 [C. C. A. 1]); and, if the claims when construed in the light of the specification and prior art disclose a meritorious invention,—a truly valuable advance step in the art,—courts will go as far as possible in upholding such claims. Cf. Permutit Co. v. Wadham, 13 F.(2d) 454 (C. C. A. 6); Cincinnati Cadillac Co. v. English & Mersick Co., 18 F.(2d) 542 (C. C. A. 6).

The prior art in the instant case and the extent of the disclosure of the specification upon the subject of pressure are fully set forth in the opinions rendered upon other adjudications of the patent in suit. See Claude Neon Lights v. E. Machlett & Son, 27 F.(2d) 702 (C. C. A. 2); the same case on subsequent appeal (C. C. A.) 36 F.(2d) 574, 578; Claude Neon Lights v. American Neon Light Corp., 39 F.(2d) 548 (C. C. A. 2); Claude Neon Electrical Products, Inc., v. Brilliant Tube Sign Co., 40 F.(2d) 708 (D. C., Washington), reversed 48 F.(2d) 176 (C. C. A. 9); and the report of the special master in Electrical Products Corporation v. Neale, Inc., 48 F.(2d) 824 (D. C., So. Dist. Cal., Central Div.). Repetition in detail need not here be made. It is sufficient to say, as Judge Hand said in the second Machlett Case, that the prior art "understood all that took place; the cathode drop, its effect upon the electrode, the resulting imprisonment of atoms of the gas, the consequent exhaustion of the gas and its final rarification to the point of non-conduction."

Nor do we consider that Claude was the first to conceive that the use of electrodes of vastly increased surface area would reduce "sputtering" and volatilization of the electrodes, and thus conduce to a longer life of the tube by decreasing the imprisonment of atoms of the gas in the plating adjacent such electrodes. See patent to Moore, No. 755,306, March 22, 1904. What Claude really discovered was that the conductivity of a pure neon gas, and its great resistance to chemical change when rendered luminous by electric current, were such as to peculiarly adapt it to use in Geissler tubes of the Moore type. Claude himself said in one instance: "I have succeeded beyond my expectations in the way of a utilization of neon, in simple Geissler tubes, similar to the Moore tube." The subject of his patent was a luminescent tube. The change over the prior art—the advance step—was the substitution and efficient maintenance, in a Moore tube, of neon in lieu of the commoner gases theretofore used (nitrogen and carbon dioxide). This substitution enabled him to employ a higher pressure (greater volume) of the gaseous content, which, neon also being more inert than the gases formerly used, dispensed with the necessity of periodic replenishment of the gas through a breather valve. The large tubes, the greatly enlarged electrodes, the increased quantity and pressure of the gas, possible only with neon, and the intrinsic nature of the neon gas itself, all contributed to an increased longevity and commercial utility.

But this step was not a mere substitution of materials theretofore recognized as available equivalents for such a purpose; it was a true combination, albeit of known or old elements, co-operating to produce a new product which was available for an enlarged commercial use because of its inherent properties and its longer life. It is immaterial that Claude apparently regarded the peculiar orange-red color of the light emitted by neon, when ignited, as a detriment (French patent to Claude, No. 434,525, Feb. 6, 1912), or that he may not have as fully understood, as is the fact to-day, the principles underlying the operation of his tube, the relationship between sputtering and current density or the cathode drop, the effect of pressure in the determination of the most efficient operative ratio between electrode surface area and current density, the part played by heat in the volatilization of the electrodes, and the like. It would seem enough if he made a valuable contribution to the art, even though by a

substitution of the material of which one element of those combined consisted, provided such substitution involved invention, as we think was the case here. Smith v. Goodyear Dental ·Vulcanite Co., 93 U. S. 486, 496, 23 L. Ed. 952; Edison Electric Light Co. v. U. S. Lighting Co.; 52 F. 300, 308 ('C. C. A. 2); Walker on Patents (6th Ed.) § 66; and compare, Corona Co. v. Dovan Corp., 276 U. S. 358, 369, 48 S. Ct. 380, 72 L. Ed. 610.

Construing the claim in the light of what has already been said, appropriate pressure to make the tube operative must be understood. The specification contains a somewhat ambiguous translation of the French "de l'ordre du millimètre de mercure" as indicating an acceptable or preferred pressure, but this is followed immediately by "that is to say at least ten times higher than in nitrogen tubes resulting in a provision of gas which is likewise more than ten times greater." There is evidence indicating that the Moore tubes were operated at about two-tenths of a millimeter of pressure and this operating pressure of one or two millimeters seems to conform with the disclosures of the French patent to Claude, No. 424,190, May 6, 1911, where he says that, upon immersion of the carbon container in liquid air, "the internal pressure falls, for instance, to one or two millimeters due to the fact that the carbon will soon absorb the gases, that is, all of the oxygen, all of the nitrogen, and a portion of the neon and of the helium." There is also evidence tending to prove that Claude was especially interested in illumination or volume of light, and that it is at pressures of one or two millimeters that the greatest intensity of lighting effect is obtained. Thus the appellants urge that foundation is laid for the argument that, if an operative pressure is to be implied, it cannot exceed 2 mm., and at that pressure the patent must fail for want of commercial utility, that a life of at least 1,000 hours is required, and that at even two millimeters pressure the life of the tube would be far less than the minimum requirement for successful operation. No contention is made, however, that the tube was inoperative at these lower pressures, or that the use of neon at ten times the pressure of the commoner gases previously used did not greatly increase the life of the tube. The only contention is that it did not increase such life to at least 1,000 hours. Conceding that present day competitive conditions require a life of 1,000 hours, that Claude contemplated the use of say 2 mm. pressure, that at this pressure the life of the tube would be much less

than 1,000 hours, and that the present great commercial utility of neon tubes is due almost exclusively to the later discovery by some one of the advantages of using pressures as high as 15 mm., or even 20 mm., the argument still falls far short of establishing invalidity. The invention of Claude was the primary one on which all subsequent developments were founded. The test is not that of commercial utility, but rather of operative utility and the forward step. The patent is entitled to that liberality of construction which is accorded generic inventions, and so construed we find no lack of utility in the sense of the Patent Act. The Telephone Cases, 126 U. S. 1, 535, 8 S. Ct. 778, 31 L. Ed. 863; Hildreth v. Mastoras, 257 U. S. 27, 34, 42 S. Ct. 20, 66 L. Ed. 112; Mergenthaler Linotype Co. v. Press Pub. Co., 57 F. 502, 505 (C. C., N. J.); Scott v. Fisher Knitting Machine Co., 145 F. 915, 922 (C. C. A. 2); A. B. Dick Co. v. Barnett, 288 F. 799, 801 (C. C. A. 2); McDonough v. Johnson-Wentworth Co., 30 F.(2d) 375, 380 (C. C. A. 8).

In this connection it is also to be observed that, although an operative pressure is to be implied when construing the claim, the pressure used by Claude and indicated by his specification (according to appellants' contention) does not serve to limit the claim to that pressure and that alone. The Paper Bag Patent, 210 U. S. 405, 418, 28 S. Ct. 748, 52 L. Ed. 1122. The claim is silent as to pressure. There is thus no limitation, and any and all operative pressures are therefore included. The appellants failing in the defense of nonutility of a neon tube of one or two millimeters pressure, they must also be held to have failed in the defense that, under Rev. St. § 4888 (35 USCA § 33), the description is insufficient to permit one skilled in the art to practice the invention, for the specification at least teaches the construction of a tube of that pressure and kind. At best, the greatly increased pressure of the more modern device is but an improvement which does not invalidate the original patent.

Finally, it is claimed that at the indicated pressure of say, 2 mm., the ratio of 1.5 square decimeters of electrode surface area per empere of current, stated in the claim, is arbitrary and meaningless, and, since it was this pressure of not to exceed 2 mm. which Claude had in mind, the indicated ratio did not represent a "critical point," above which all was good and below which all was bad, and this invalidated the claim. We do not deem it necessary, in order to uphold the claim, that

the stated ratio designate a critical area, as was found by Judge Manton in the first Machlett Case (C. C. A.) 27 F.(2d) 702, 706. It seems to us that an applicant for a patent may be partly arbitrary in the selection of a limitation above which he claims and below which he abandons his invention to the public. Minerals Separations, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286, is expressly in point. Doubtless the Patent Office requires such limitation in many cases, while in others a greater indefiniteness has been allowed. See Mowry v. Whitney, 14 Wall. 620, 644, 20 L. Ed. 860; Tilghman v. Proctor, 102 U. S. 707, 729, 26 L. Ed. 279; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 22 S. Ct. 698, 46 L. Ed. 968; Eibel Co. v. Paper Co., 261 U. S. 45, 66, 43 S. Ct. 322, 67 L. Ed. 523; and other cases already cited. The rule upon which the appellant relies forbids only such limitations as are wholly arbitrary, that is, which in no true sense describe or define the nature of the invention and its departure from the prior art. Such is not the case here. The ratio of 1.5 is descriptive of a vastly increased surface area of the electrodes over those used in the spectral tubes of the prior art, the only tubes theretofore employing a content of neon. At some pressures the ratio does indicate a "critical point." At all pressures it is indicative of an important element of the invention. We have no serious doubts in this connection, but, if we had, we should feel constrained to resolve them in favor of a finding of validity, in consideration of the doctrine of Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 488, 20 S. Ct. 708, 44 L. Ed. 856.

The individual organizers and officers of the defendant Sun Ray Gas Corporation were made defendants, and were included in the injunction; but the accounting was not decreed as against them. Under the facts disclosed by this record, we are of the opinion that the injunction, at least, was proper. See Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf B. Co., 230 F. 120, 140; D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236, both decisions of this court.

Affirmed.

DENISON, Circuit Judge.

I concur; but, when we take together the specification and the publications which by reference it incorporates, the record indicates to me, in a fairly satisfactory way—though not as clearly as would be desirable—that the older gases were in familiar use in the spec-

tral and similar tubes, at pressures averaging 5/10 of a millimeter; so that, multiplying by ten, Claude was contemplating and disclosing a use of perhaps 5 mm. If this view were correct, it would remove much of the difficulty coming from a somewhat uncertain translation of a French idiomatic phrase, which probably, as such phrases do in English, takes variant meanings from variant contexts. This view, too, makes the stated ampere-electrode ratio indicate, not a critical point in any close sense, but an approximation, and suggests that, by including this ratio as an element of his claim, Claude has only failed to inclose a fraction of his field.