CLAUDE NEON ELECTRICAL PRODUCTS,
Inc., v. BRILLIANT TUBE SIGN CO.
et al.

No. 601.

District Court, W. D. Washington, N. D.
March 28, 1930.

William Bohleber, of New York City, Leonard S. Lyon and R. E. Caughey, both of Los Angeles, Cal., and G. Wright Arnold, of Seattle, Wash., for plaintiff.

Caldwell & Lycette, Weldon G. Bettens, Dean H. Eastman, and C. L. Reynolds, all of Seattle, Wash., for defendants.

CUSHMAN, District Judge.

At the threshold of the case the court is asked to uphold the validity of the patent on two grounds. First, by virtue of the doctrine of comity; second, because of the presumption of validity arising from the grant of the patent, reenforced by reason of the great and rapid success of the patented invention. As consideration of the two foregoing matters, in one particular at least, converge upon the same point of fact, they will be considered in the order stated.

There is no doubt of the desirability of the doctrine of comity in patent cases. Mast, Foos & Co. v. Stover Manufacturing Company, 177 U. S. 485–488, 20 S. Ct. 708, 44 L.

Ed. 856; Jay et al. v. Suetter et al. (C. C. A.) 32 F.(2d) 879, 880; Cookingham v. Warren Bros. Co. (C. C. A.) 3 F.(2d) 899–901; Strauss Bascule Bridge Co. v. City of Seattle (C. C. A.) 5 F.(2d) 229, 230.

In Jay v. Suetter, supra, it was held that the rule of comity should obtain where "in point of neither fact nor law does the record before us exhibit anything new of substance."

In Strauss Bascule Bridge Co. v. City of Seattle, supra, it was held that the rule of comity did not apply, the Court saying: "But it appears that in the present application for injunction the court had before it certain material evidence which was not before the court in the case cited."

It is therefore necessary to consider whether the evidence in the instant case is the same or may be presumed to be the same as that in Claude Neon Lights, Inc., v. E. Machlett & Son (D. C.) 21 F.(2d) 846, affirmed (C. C. A.) 27 F.(2d) 702, upon authority of which the above-cited cases have, in the main, been determined.

Before taking up this question, consideration will be given to the presumption arising from a patent and the commercial success of a patented invention.

The Circuit Court of Appeals for this circuit has given full recognition to the presumption of validity arising from a patent, general use and commercial success. Bankers' Utilities Co. v. Pacific National Bank, 18 F.(2d) 16–18; Morton v. Llewellyn, 164 F. 693–697, particularly where there is no explanation for such success other than the merit of the invention, Sherman-Clay & Co. v. Searchlight Horn Co., 214 F. 86–94. If it had come immediately into general use and largely replaced all other similar things without the aid of advertising, the evidence of invention would have been at least persuasive. Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 262, 37 S. Ct. 82, 61 L. Ed. 286.

"Commercial success so often results from causes other than meritorious invention that the causes of success must be scrutinized with the utmost caution before accepting the fact of success as proof of invention." Franc-Strohmenger & Cowan v. Siegman (D. C.) 25 F.(2d) 108, 110. See, also, Johnson v. Lambert (C. C. A.) 234 F. 886–889.

The business of electrical products corporations (that of Arizona being the original plaintiff herein) in this field has increased from a total of $727,817.68 in 1926 to $5,226,377.79 in 1928.

The report of the special master in the case of Bellows-Claude Neon Company et al. v. Sun Ray Gas Corporation et al., 39 F.(2d) 907, No. 2382 in the Northern District of Ohio, Eastern Division, a certified copy of which has been furnished the court by plaintiff's attorney since the trial of this case, states: "This form of advertising has met with widespread success, it is only necessary to mention the increase in business from $190,000, done in 1924, to $19,000,000, done in 1928, together with the great amount of litigation which has arisen in connection with this patent, resulting in some twenty or twenty-five lawsuits."

No one will deny that the neon tube lamp has, in a half decade or less, swept the streets of our cities like a red flame.

This patent was applied for in November, 1911, and the patent was issued in January, 1915.

While the mere fact of delay in the success of the neon tube lamp, marked as that success has been, will not destroy the presumption of invention, it is sufficient to require a close scrutiny and searching inquiry to determine the cause of delay, and whether the successful article departs from the combination described in the patent.

At the outset we are met with the challenging maxim "post hoc ergo non propter hoc."

Two reasons have been advanced by the plaintiff for this long delay. The first is that it was owing to the restrictions placed upon the use of electric power during the World War. The second is that it was necessary for the inventor to make financial arrangements for the marketing of his invention.

No evidence has been introduced that the patentee was hindered or delayed in any way by any restriction upon the use of electric power as a war measure or otherwise. The testimony in the case is that less electric energy is needed per candlepower for a neon light than for the incandescent bulb.

The report of the French experts (Plaintiff's Exhibit No. 47, page 9) states: "But Neon is a very rare gas. It can be found only in the air and with a content comprised of between one hundred thousandths and one millionths. It would be inaccessible if it were not concentrated with helium as uncondensed residue of liquid air."

From the foregoing it appears that Neon is a by-product of the separation of helium from the other gases of the atmosphere.

It is no secret that ever since 1914, when a shell was fired through a German balloon and it failed to catch fire, the nations have been on a helium hunt. Encyc. Britt. (14th Ed.), article on "Helium."

In the popular understanding helium is a by-product of the World War. It therefore appears unreasonable to conclude that any war restriction delayed the use of the neon tube as a light.

There is no evidence that the patentee, Georges Claude, needed financial assistance in exploiting his invention.

In Plaintiff's Exhibit No. 34 (Report of the Committee on Progress, Illuminating Engineering Society, made in September, 1912) Dr. C. H. Sharp mentions Claude's extensive works for the liquefaction of air in the suburbs of Paris turning out liquid air in tremendous quantities, from which it is reasonable to conclude that the patentee was not a man without substance. It is shown in evidence that he is popularly known as the "Edison of France." That fact justifies the court in concluding that his credit would be ample.

There is no evidence in the case that extensive financial assistance would be necessary to market a successful neon tube lamp. The impression gained by the court in the trial is that the equipment necessary in order to construct such a lamp (the neon being itself obtainable as an article of commerce) is inexpensive, which, in part, probably accounts for the great number of law suits over the patent mentioned by the master in the Sun Ray Case, supra.

It is in order to consider other causes which may have contributed to the success of the Neon lamp so long after the patentee's discovery.

The French experts, in their report (Exhibit No. 47) state: "The application of these processes with respect to industrial tubes was difficult at the time of the creation of the Neon tube. The vacuum apparatus were less perfected than they are today. The glass then available on the market retained a considerable quantity of gas, while the glass available at present, which can stand comparatively high temperatures, can be readily freed of said gases."

Another reason may be that later facilities were greater for procuring an ample supply of commercially pure neon. Another doubtless is that as the neon tube lamp, to survive, must be able to compete with the incandescent lamp, the discovery of the tungsten filament now used in the incandescent lamp, which greatly improved it, increased

the obstacles to be overcome. See General Electric Co. v. Independent Lamp & Wire Co., Inc. (D. C.) 267 F. 824.

While "previously purified" neon is one of the elements of the claim, there is no amount of pressure of that gas described in the claim.

The evidence has shown that the most satisfactory pressure is that of between seven and eight millimeters of mercury. The court is in no position to determine what effect, if any, the discovery of this most effective pressure may have had on the success of the Neon tube lamp for there is no evidence in this cause as to the date of that discovery and the time when the knowledge became public 'of such efficient pressure.

Claude was directing his efforts to securing a long life tube. The claim states the result attained by the described combination as: "Whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas."

It is stated in the specification:

"In the conditions thus determined the important result is attained that the luminosity of the tubes may remain substantially constant for a very long time without a fresh introduction of gas. In this manner a sufficiently long life may be arrived at for avoiding fresh introduction of gas, the tubes being replaced after use like incandescent lamps. * * *

"The slowness of the disappearance of the neon is facilitated owing to the fact already pointed out in the specification referred to that the pressure in the neon tubes may be of the nature of a mm of mercury, that is to say at least 10 times higher than in the nitrogen tubes resulting in a provision of gas which is likewise more than 10 times greater."

It is first necessary to determine whether the language here used has the meaning which plaintiff contends it has—that is, that it describes a range of pressure as high as 10 millimeters, of mercury—before considering the question of whether, with such meaning, it would be a sufficient disclosure or not.

The amount of pressure is not discussed by the Circuit Court of Appeals in Claude Neon Lights v. Machlett & Son, 27 F.(2d) 702, other than to state, at page 704: "Greater volume of gas secures a greater life of the tube because it requires a longer time to absorb, and the patentee specifies the use of neon at a pressure of 'the nature of a milli-

meter of mercury,' which is said to be 10 times more than Moore used in his tubes."

But in the case affirmed, Claude Neon Lights v. E. Machlett & Son (D. C.) 21 F. (2d) 846, 848 and 849, the court said:

"Defendant contends that the only controlling factor in the life of the tube is the degree of pressure of the gas employed, and that this fact is not disclosed in the patent in suit, but, on the contrary, the disclosure of the patent in suit is inconsistent therewith.

"In my opinion defendant did not sustain this contention, because the life of the tube may be lengthened by increasing the length of the tube, thus obtaining more gas, and also because with the ordinary working pressures of between two millimeters and eight millimeters it does not make much difference on the critical value of the area of the electrode, 1.5 square decimeters per ampere.

"The patent discloses that the pressure of neon in the tube may be of the nature of a millimeter of mercury, and it is a scientific fact that the degree of pressure at which neon is most conductive is of the order of one millimeter of mercury."

The evidence upon which Judge Campbell so found is not before this court.

The master in Bellows-Claude Neon Company et al. v. Sun Ray Gas Corporation et al., 39 F.(2d) 907, Northern District of Ohio, Eastern Division, in his report filed June 27, 1929, states: "The tube having been deprived of these impurities, commercially pure neon gas was admitted to the tube to a pressure estimated by the expert as 7.3 MM. With the normal operating current, the true neon color appeared, and the tube was sealed off."

Neither the master nor the court in that case discuss that part of the specification of the patent above quoted, relating to pressure.

On this question, Dr. S. S. McKeown, an expert testifying for plaintiff, stated in part, as follows (Tr. pages 450 to 456) after quoting the specification last above set out:

"He (Claude) refers to a pressure in both the Comptes Rendus article and in that French patent—in the French patent No. 424190 which he refers to, in the patent suit, he says, starting in the first paragraph of page 2 of the translation:

" 'The necessity of operating with pure gases has also made it possible to discover another important fact, namely, that by reason of the exceptional weakness of the elec-

tric cohesion of rare gases of great purity, considerably higher pressures may be employed than is allowable with other gases. (For instance of an order of magnitude of one m. m. mercury.)'

"In the Comptes Rendus article he says—this is starting at the last paragraph of page one of the translation:

" 'It is true that in the case of the neon, the circumstances lend themselves relatively well to this elimination; besides the fact that the neon is a gas reputed inactive and on which the electrodes should leave indifferent, its electric cohesion, so extraordinarily weak, permits the use of a pressure quite superior to that which prevails in the nitrogen tubes or on the order of the millimeter of mercury and no longer on that of 1/10 millimeter. Whence a supply of neon at least 10 times as great, giving a much wider margin for its exhaustion.'

"This expression which he uses in the patent, in the nature of a millimeter of mercury, in the French patent corresponding to this suit, the French word is "order" rather than nature. In the French patent referred to in the patent in suit he speaks of order of magnitude of a millimeter of mercury and in the Comptes Rendus, of the order of a millimeter of mercury.

"All those terms are used to define a range of pressures. The use of such expressions as order of magnitude—the order is in common usage in scientific work to define a range, either in one of two cases—either where the exact value may not be of importance, or, where the exact value cannot be determined. * * *

"Claude in the second part here, when he speaks of that, I interpret that to mean a range there of a millimeter of mercury—order of magnitude we speak of, as indicating the decimal point. That is, in a measurement such as that of the distance of the spiral nebulae from the earth, if they agree within a factor of ten—measurements which are very difficult we say they agree within the same order of magnitude, meaning that the decimal point is about in the right place. * * *

"Claude is more specific in the second part of that paragraph, and he does very definitely set a low limit on the measurements that can be used. I will read the whole paragraph:

" 'The slowness of the disappearance of the neon is facilitated owing to the fact already pointed out in the specification referred to that the pressure in the neon tubes may be of the nature of a millimeter of mercury, that is to say at least ten times higher than in the nitrogen tubes resulting in a provision of gas which is likewise more than ten times greater.'

"Now a nitrogen tube operates satisfactory as an illuminating tube—by that I mean the nature of the discharge—there is a certain range where it gives off light. I do not mean at all it is satisfactory commercially, but it will give off light from a range of about from one tenth to one millimeter pressure. That is again approximately the limit in which a neon tube will act, disregarding the cost or the amount of light given off as a luminescent tube. If you decrease your pressure below that, you get into the x-ray field where practically no light is given off, the only light being the fluorescents on the glass walls, and if you go beyond that pressure, your positive column of gas becomes a wabbly ribbon—you lose the characteristics of the glow discharge. And when Claude says that the pressure is, in the case of neon, ten times higher than the nitrogen tube, he puts a low limit on the pressure to be used in the neon tube. He says you can use at least ten times greater pressure than you can in the nitrogen tube, and as the pressure in the nitrogen tube runs from approximately one tenth to one millimeter, or higher, and it is not until you get to even higher ranges than that that the positive column loses its luminous qualities, and he puts a low limit on, and he says that your gas tube should have a pressure at least ten times greater—not less than ten times. He does not specify what should be the upper limit at all. The best pressure to use is a pressure around seven and one half millimeters or thereabouts."

In rebuttal, after testimony of witnesses for the defense, presently to be stated, he testified (Tr. pages 1290 to 1293):

"Q. Can you determine from the disclosures in the Comptes Rendus article referred to in the specification of the patent in suit the order of magnitude of pressure employed by Claude in the tubes there referred to? A. You can determine a lower limit to that pressure; that is, you can determine from the data that he gives in that article that his tubes had a pressure greater than a certain amount.

"Q. Will you refer to the data in that article or address to which you refer and explain how you can make that determination and what the lower limit of that pressure was, in fact? A. Yes, on page four of the translation, which is in evidence, the last sen-

tence on that page, Claude says: 'But by bringing the surface of the electrodes to five square decimeters per ampere I managed to diminish the vaporization still further and to register already, with a six meter tube, a duration of 400 hours, without any further alteration in the system, excepting an almost insensible lowering, or four per hundred altogether, of the potential difference at the terminals.' That means that in running for 400 hours this tube required slightly lower voltage to operate it than it required initially.

"Now, in operation the pressure of neon must necessarily be diminished by some amount; it could not have possibly increased. That means, then, that this tube was operated so that as the pressure of neon decreased the potential difference necessary to operate the tube decreased also. This means, then, that the pressure at which he was operating or at least the pressure initially in this tube was greater than the pressure at which the potential difference or voltage is a minimum. Now, that value for the potential difference is known, and it is approximately eight millimeters pressure.

"Q. Then, what was the minimum pressure that actually existed in the tubes that Claude is referring to? A. The minimum pressure was greater than approximately eight millimeters. That is, Claude started that tube with a pressure greater than eight millimeters pressure in it.

"Q. You have heard the testimony of the various witnesses for the defendants regarding the meaning of the paragraph in the Claude patent relating to the use of a pressure of the order of one millimeter or the order of a millimeter, and the pressure exceeding ten times that in nitrogen tubes, have you not? A. I have.

"Q. Has anything that has been said here caused you to vary the opinion that you have given as to the meaning of that phrase? A. No. I would like to give my reasons a little further as to why I still am of the same opinion. I did not point out previously that nitrogen, as was well known in the standard text books on gas discharges which were printed prior to 1910, operates in a gas discharge tube at pressures exceeding even one millimeter; and, consequently, the pressure which Claude refers to when he speaks of pressure in nitrogen tubes must have extended at least up to one millimeter. Now, Claude puts in as a minimum ten times the pressure—that is, he specifies a pressure at

least ten times higher than in the nitrogen tubes. So that since nitrogen tubes were well-known to operate at pressures even in gas of one millimeter, this must mean pressures up to ten millimeters or even higher; at least as high as ten millimeters.

"Q. Now, if a tube had been built at the time of this patent employing, say, only one millimeter of pressure and in operation the tube went out very quickly, what would that indicate to one skilled in the art at that time? A. Well, Claude very definitely in his Comptes Rendus article points out that the life of the tube depends on the quantity of gas present; and does so in his patent in suit. So, very definitely, it would be apparent to anybody skilled in the art that the quantity of gas should be increased—that is, the pressure should be increased. Claude points that out very definitely in the patent in suit—in the French patent referred to in the patent in suit and in the Comptes Rendus article."

We are now concerned with the meaning of the words "of the nature of a millimeter" and not with the meaning of those other words considered by Dr. McKeown, "of the order of one millimeter" and "of the order of a millimeter." That the word "order," in French, may have such a meaning as that given it by Dr. McKeown would appear from the following in the report of the French experts (Exhibit No. 47):

"Pressures of the same order as those of the Claude tube have been utilized in the case of Helium by Nutting (document No. 5, supplied by the Defendants), who proposed to establish a photometric standard. * * *

"Only one work can arrest attention here, that of Nutting (loc. cit.) who, in the case of helium, gave his attention precisely to the influence of the pressure upon the luminous efficiency. This author used pressures between 2 and 10 millimeters of mercury."

Concerning the meaning of this expression in the specification "of the nature of a millimeter of mercury," witnesses for the defendants testified.

Mr. William H. McCurdy, associate professor of physics, University of Washington, testified as follows:

"Q. What pressure does the patent then teach should be used in the tube? A. Under the conditions considered a quantity mentioned which could be measured with accuracy to better than one per cent. I should say that a variation of one hundred per cent either way should be all that the patent would allow.

"Q. If you were making a tube following the specifications of the patent, what pressure would you employ? A. I would employ a pressure between one and two millimeters of mercury.

"Q. What do you understand by a pressure of the order of the millimeter of mercury? A. As I have stated, pressure ranging from a millimeter to one hundred per cent. either way.

"Q. Not greater than two millimeters? A. Not greater than two millimeters, and not less than one hundred per cent. of one, which would be—

"Q. You would get it right down to zero? A. Yes."

Dr. Henry K. Benson, professor of chemical engineering, University of Washington, testified:

"Q. What is meant by a pressure in the nature of a millimeter of mercury? A. I would interpret that to mean 'of the nature of a millimeter of mercury' to be approximately a millimeter of mercury. The limitation as to how much more or less than a millimeter of mercury approximately means—I would interpret that, so far as my own use in the literature of the term 'approximately' is that it would be the next order of the digits of decimal type. That is, it would not be more than 1.9 millimeters nor less than .1 of a millimeter. If I meant more than that I would then say 'a few millimeters of mercury,' but I would say, as we frequently do, one to two. If it were desired to extend—to be more approximate even than that, one might say 1.5, as we do frequently. In our chemical work we make use of approximate volumes and pressures, both cubic centimeters and millimeters. But if we wish to be indefinite or approximate we usually cite the first and the last limit of that approximation. In the absence of that I would hold very strictly to the digit which is mentioned."

Mr. J. D. Ross, superintendent of lighting for the city of Seattle, testified:

"Q. What is the meaning of the phrase of the nature of a millimeter? A. Approximately a millimeter—or perhaps a little looser than a millimeter. Had it been intended, for instance, to be two millimeters, he would have said of the nature of two millimeters, and so it is somewhere between several per cent on either side of one millimeter I would say.

"Q. Does that phrase of the nature of the millimeter indicate a range of pressure? A. I would not say so, no sir.

"Q. What is the meaning of the pressure of the order of the millimeter of mercury? A. I would say that it was practically the same.

"Q. Does that phrase express a range of pressures? A. No, sir.

"Q. What would you say as to the maximum pressure embraced within that phrase? A. Perhaps fifty per cent variation either way.

"Q. So that the maximum pressure would be a pressure of how many millimeters? A. One and one half."

The Circuit Court of Appeals in this circuit has said (Petroleum Rectifying Co. v. Reward Oil Co., 260 F. 177, 181): "It [the patent] should receive a fairly liberal construction—a construction that will uphold rather than destroy."

If the meaning of the words of the specification as stated by Dr. McKeown is not repugnant to the terms used, it will be assumed that the disclosure is sufficient and the combination described useful.

No lexicographer giving to the words "nature" or "of the nature," the meaning attributed to them by Dr. McKeown, has been cited or found by the court.

In the Claude patent No. 1,131,910 (Defendant's Exhibit No. A–40) for a neon "vacuum discharge tube for lighting purposes" it is stated in the specifications (page 1, lines 47 to 53): "This is that by reason of the exceptional weakness of the electrical cohesion of very pure neon, far higher pressures can be employed than with other gases (in the neighborhood of millimeters of mercury) and that these high pressures are favorable to high luminous efficiency."

The use in this patent of the word "neighborhood," where, in the other patents the word "nature" or "order" is used, indicates that the patentee used the word "nature" with a meaning approaching that given it by the defense witnesses rather than that given it by Dr. McKeown.

Plaintiff contends that the patent is not limited to any particular pressure.

It is true that the claim of the patent does not refer to the nature of the invention being specifically as set forth in the specifications, but for the present inquiry that fact is not of consequence. It was said by the Circuit Court of Appeals in this circuit in Greenawalt v. American Smelting & Refining Co., 10 F.(2d) 98, 99, 100: "The specifications and the whole language of the patent must be looked into, in determining its claims of

invention, and the specifications and claims must be read together. Mitchell v. Tilghman, 19 Wall. 287, 22 L. Ed. 125; 1900 Washer Co. v. Cramer, 169 F. 629, 95 C. C. A. 157; Royal Co. v. Tweedie (C. C. A.) 276 F. 351."

The fact that a patentee does not understand his own mechanism or does not state its full capacity or specify all of its advantages will not invalidate his patent if his invention is described, and it produces a new and useful result. Marconi Wireless T. Co. v. De Forest Radio T. & T. Co. (C. C. A.) 243 F. 560; Diamond Rubber Co. of N. Y. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527.

The court is not concerned with what Claude may have known, apart from what he stated in the specifications of the patent in suit, for if the means described by him do not accomplish the described result (and it must be a useful result), the patent is void. Mitchell v. Tilghman, 86 U. S. (19 Wall.) 287–398, 22 L. Ed. 125.

In addition to a theory there must be a tangible reduction to practice. The transformation of a laboratory experiment into a successful and useful mechanical device is evidence of such tangible reduction to practice, and of invention. Marconi Wireless Telegraph Co. v. De Forest Radio T. & T. Co. (C. C. A.) 243 F. 560. ·

While the meaning of the expression "in the nature," may be a degree broader, it is not greatly different from that of the words "corresponding to" as they are used in the claim of the patent No. 1,180,159 for an incandescent nitrogen or gas lamp where the pressure in one claim is described as "corresponding to 50 mm of mercury." General Electric Co. v. Nitro-Tungsten Lamp Co. (C. C. A.) 266 F. 994.

Webster's Revised Unabridged Dictionary, 1918, defines "nature," as here used, as follows: "The sum of qualities and attributes which make a person or thing what it is, as distinct from others."

To the same effect, Ford v. Baker (Tex. Civ. App.) 33 S. W. 1036, 1037; cited in 5 Words and Phrases, First Series, p. 4674; Montgomery v. State, 68 Tex. Cr. R. 78, 151 S. W. 813–817, cited in 3 Words and Phrases, Second Series, p. 523; Fitch v. Green, 39 Okl. 18, 134 P. 34, 38, cited in 5 Words and Phrases, Third Series, pp. 317, 318; State v. Dougherty, 4 Or. 200–203.

Expert witnesses will be heard as to the meaning of technical terms, Seymour v. Osborne, 78 U. S. (11 Wall.) 516–546, 20 L.

Ed. 33, but there is nothing technical about the words "of the nature" requiring expert testimony in explanation.

The proximity of the pressure to that of a millimeter of mercury is the one thing stated that would distinguish it from pressure more nearly equal to that of some other number of millimeters, whether that number was two or more.

As already stated, the wording of the specification is: "That the pressure in the neon tubes may be of the nature of a mm. of mercury, that is to say at least 10 times higher than in the nitrogen tubes."

The plaintiff's expert, Dr. KcKeown, contends that by this language Claude fixes a low limit. He says that the gas tube should have a pressure at least ten times greater, not less than ten times, than with a nitrogen tube and that as the pressure in nitrogen tubes was well known that it follows that the above-quoted language includes the most effective pressure, which he testified is around 7.5 millimeters of mercury. Manifestly that is not true.

The language "may be of the nature of a millimeter of mercury" signifies that it is possible to use a pressure that great. These words being followed by "that is to say, at least 10 times higher than in the nitrogen tubes," while they may show a doubt in the mind of the inventor as to whether the pressure in a nitrogen tube would equal $\frac{1}{10}$ of a millimeter, certainly does not indicate a greater pressure of neon than a millimeter of mercury.

That the word "may" was intended to be used with the meaning above stated, is shown by the following from the report of the patentee (Exhibit No. 33) of May 22, 1911: "its (neon) electric cohesion, so extraordinarily weak, *permits* the use of a pressure quite superior to that which prevails in the nitrogen tubes or on the order of the millimeter of mercury and no longer on that of $\frac{1}{10}$ millimeter. Whence a supply of neon at least 10 times as great, giving a much wider margin for its exhaustion." (Italics the court's.)

To attribute to the words "of the nature of a millimeter of mercury" a meaning that would include ten millimeters of mercury would be to stretch the meaning of the word "nature" and the words "of the nature," beyond all reason.

It is part of the duty of the court to defend the king's English, for it is the language of government, laws, and contracts.

It may be that the words "at least 10 times higher" were used to emphasize and fix the attention upon the fact of the great difference (1,000 per cent.) in the pressures stated.

Unless the words of this specification were used with the above meaning then the word "may," expressing a doubt, and the words "at least," expressing assurance, become "weazel words" each sucking the blood of the other, and the specification merits reproach. "It requires no great ingenuity to mystify a subject by the use of abstract terms of indefinite or equivocal meaning." Westinghouse v. Boyden, 170 U. S. 537–556, 18 S. Ct. 707, 716, 42 L. Ed. 1136.

If used as contended the words leave one claiming under the patent free to alight on either side as should prove advantageous. It requires no more ingenuity, if it is known, to describe a maximum than it does a minimum. The patentee fixes a minimum area for his electrode—1.5 square decimeters per ampere. If the patentee meant to describe a range of pressures of gas with a minimum of 1 millimeter and a maximum of 10 millimeters, a man of the commonest understanding could have done so in words that would not mystify.

Dr. McKeown argues that as it had been written prior to the application for the patent, by one Thomson, that nitrogen might be used in tubes with a pressure of a millimeter, Claude must have known that fact and had it in mind in writing the above specification. Were the question one of anticipation such a presumption might follow, but this would be a presumption of statute and not one of fact.

The patentee did not testify in this case and it would appear, so far as disclosed by the decisions, that he has not testified in any case brought in the United States involving this patent.

We are not concerned with what Claude knew or meant, as might be were we now considering Walker's eleventh defense, but only with what he taught in the specifications. Are the terms above used full, clear, concise, and exact as required by section 33, tit. 35, USCA?

The French experts in their report (Exhibit No. 47) dwell upon the fact that Claude's researches were original. In their report it is said: "Thus, it appears that Claude who by himself again ascertained the action and the laws referred to above, could have reached his objective with less effort than he used, if his temperament had not urged him to undertake his experimental researches without bothering to compile a scientific bibliography sufficiently developed. Without referring to the original documents scattered in universal scientific literature, under the form of notes or numerous descriptions, published in various periodicals, written in different languages, and under sometimes disconcerting titles, it was possible at least to consult special and classical works, such as the Treatise on Spectroscopy by Baly, and the Treatise of J. J. Thomson, on the conduction of electricity in gases. Nothing in either what Claude says nor what the Defendants say shows that either one or the others took this trouble."

It is not to be presumed that if Claude did not concern himself with reading the scientific literature regarding neon that he had read all of the articles touching on the pressure in nitrogen tubes.

■ The defense made by the amended answer, in so far as it is necessary to consider them, appear in paragraphs V, XII, and XIII and are the 4th, 11th, and 12th defenses as outlined in Walker's classification. The 4th and 12th defenses will be now considered. That is that the patent is invalid because the alleged invention is not useful, and because the descriptions in the specifications are not in such full, clear, concise, and exact terms as to enable persons skilled in the art or science, to which it appertains or with which it is more nearly connected, to make, construct, compound, and use the same.

It follows, from the conclusion already reached, that unless with the pressure described in the specifications (which description the court holds would in no event exceed 1½ millimeters) the neon tube lamp is useful, then the patent is invalid for a false teaching and because it does not describe anything that is useful. A life of one thousand hours at least was necessary in the neon tube lamp in order that it might be useful.

It is said in Claude Neon Lights v. E. Machlett & Son (D. C.) 21 F.(2d) at page 846: "The period of time in question was undoubtedly more than 1,000 hours, because that represents the average length of the life of an electric bulb with which the tube in question would be compelled to compete"—or, as plaintiff states in its opening brief (page 79): "Claude was a scientist and realized that he had to have a neon tube which would compare favorably in life with that of an incandescent lamp."

On account of the fact that a neon tube lamp must be made at a factory and trans-

ported to the place of use and there installed, the tubes being of a brittle and fragile nature, it has been found that it is impracticable to use tubes greater than five or six meters in length, which is the length that is now ordinarily used. One principal reason for the failure of the Moore tube was the fact that it had to be constructed where used, and further, appears to have been easily injured or destroyed by breaking.

The plaintiff has contended that a pressure of from four to ten millimeters of mercury is a practicable working pressure, and such will be assumed to be the fact.

In Seymour v. Osborne, 78 U. S. (11 Wall.) 516, 548–549, 20 L. Ed. 33, the court said: "Improvements for which a patent may be granted must be new and useful, within the meaning of the patent law, or the patent will be void, but the requirement of the Patent Act in that respect is satisfied if the combination is new and the machine is capable of being beneficially used for the purpose for which it was designed, as the law does not require that it should be of such general utility as to supersede all other inventions in practice to accomplish the same object."

■ The patent will be construed to protect the discovery. Petroleum Rectifying Co. v. Reward Oil Co., 260 F. 177 (9th C. C. A.).

Concerning the question of pressure, in the report of the experts appointed by the French court, made in 1928, it is said (Plaintiff's Exhibit No. 47):

"1. A luminescent tube is in principle a glass tube comparatively long, as compared with its section, provided at its end with metallic electrodes, and filled, *under more or less pressure*, with a gas which, under the influence of electric current, is susceptible of being illuminated. The Claude Neon tubes can be well classified in this category of apparatus. * * *

"The variations of appearances with the nature of the gases used are well known. It is also generally acknowledged that the brightness of the illuminated gas is a function of its pressure, on which there also depends, for a fixed density of current, the difference in potential per unit of length of the gaseous column. The density of current going through a surface equal to the unit depends, by definition, upon the section of the tube assumed to be cylindrical. * * *

"From the foregoing observations it follows that the efficiency of a luminescent tube depends at the same time on the gas, on its pressure, and on the diameter of the tube. * * *

"It was known that in time and under the influence of the current the gases enclosed within a bulb, under a reduced pressure, would progressively disappear. The disintegration of the electrodes which is the main cause thereof, was a known phenomenon which those experimenting had been able to lessen to a certain extent. * * *

"Now, we have seen that common gases disappear in time from the luminescent tubes with deplorable ease. This is due to the fact that the luminous optimum corresponds in this case to comparatively low pressures. Whether the disappearance of the gas is due to one cause or another, it is clear that it occurs the more quickly the smaller the quantity of the gas, i. e. at lower pressures. It was known that this disappearance was in proportion to the dimensions of the electrodes. But in the case of nitrogen, huge electrodes would still have been insufficient. Hence, the necessity of a reserve of gas, communicating with the tube by a valve to maintain the pressure of the rarefied gas at its optimum value. * * *

"But he found that with this latter gas the valve became useless, whereas a pressure of the order of one millimeter meets the requirements of the luminous optimum, and provided the electrodes are sufficiently large. And while under similar conditions the small Neon tubes can last in operation only about fifty hours, the large tubes have thousands of hours of life. * * *

"Neither the pressure of the gas nor the comparatively large size of the electrodes are, properly speaking, new arrangements. * * *

"It could be supposed for geometrical reasons that by increasing the dimensions of the tubes, electrodes, and section included, their life would be slightly increased, but no methodical research had been made which made it possible to figure out the exceptional magnitude of this increase. As a matter of fact the results obtained were unlooked for.

"To sum up, if the priorities of a scientific or industrial nature were a source of information in the direction of the researches, they did not eliminate the necessity for the researches, while there was nothing to indicate the peculiar long life of the large tubes, without valve, perfected for the first time by Claude. It may even be thought that the short life of the best among the small Neon tubes was of such a nature as to render failure of the attempt a probable outcome. * * *

"Claude was the first to achieve long life tubes. Their life could be figured by thousands of hours. The cause of this remarkable long life is not due entirely to the dimensions of the electrodes. The progressive disappearance of the active gas of the luminescent tubes is the principal reason for their aging. The large electrodes are, in this respect, only a mediocre palliative in the absence of a sufficient reserve of gas. The Claude tubes having great length and large section present in this respect the advantage of containing a large volume of gas, *under a comparatively high pressure*. The spontaneous disappearance of this gas will therefore have proportionally much less importance. Thus the peculiarity of the Claude tube, which from the point of view of long life differentiates it absolutely both from the spectroscopic tubes and from the Moore tubes is that it contains in itself and without accessory device a sufficient reserve of gas in comparison to which the spontaneous elimination of the gas, already reduced by the use of large electrodes, is rendered practically negligible. Finally, the arrangements adopted by Claude to insure long life for his tubes are three in number:

" '1st large dimensions of the tube; 2d large pressure of the gas; 3d large electrodes.' * * *

"Pressures of the same order as those of the Claude tube have been utilized in the case of Helium by Nutting (document No. 5, supplied by the defendants), who proposed to establish a photometric standard. * * *

"No Neon lamp of large dimensions, provided with large electrodes containing Neon gas under pressure of the order of one millimeter, and operating thousands of hours, in an economical manner, had been described or sold commercially prior to the Claude lamp. * * *

"The authors of these patents seemed to ignore the necessity of the formation of the tubes, of the use of a determined pressure of gas, and of electrodes of large surface. No special precaution was taken to avoid the absorption of Neon by the deposit caused by the pulverization of the electrodes, nor for purging these electrodes of the common occluded gases. * * *

"The common gases used, nitrogen and carbonic gas, did not give rise to any special difficulty as far as their purification and the formation of the tubes are concerned. But especially under the low pressures used, these gases were almost immediately absorbed by the walls of the tube and the solid film which forms in the neighborhood of the electrodes. It was necessary to assure an automatic return of the gas by means of an accessory reservoir provided with an electro-magnetic valve permitting a constant maintenance of the pressure of the tube. This valve was, moreover, a costly and delicate instrument. * * *

"But the Beck apparatus cannot be considered as reduced pressure tubes. In fact, this author specifies: 1st an arc lamp between conductive electrodes in a bulb filled with helium under pressure.

"Use of a Pressure of the Order of One Millimeter.

"The pressure is of capital importance for industrial tubes. In spectroscopic tubes efforts are made, with a view to increasing their life, to use the maximum pressure compatible with the desirable luminous phenomenon, without taking into account the efficiency of the apparatus. Now, a reserve of gas corresponds to a high pressure. There is an advantage, on the one hand, in operating an industrial tube under the pressures permitting the use of as low a voltage as possible. On the other hand, one is limited in doing so by the necessity of coming as close as possible to the maximum of luminous efficiency. That is why the various pressures indicated for the spectroscopic study, which pressures range from a fraction of one millimeter of mercury to the atmospheric pressure, do not present the characteristics of priorities worthy of being taken into consideration. Only one work can arrest attention here, that of Nutting (Loc. cit.) who, in the case of helium, gave his attention precisely to the influence of the pressure upon the luminous efficiency. This author used pressures between 2 and 10 millimeters of mercury. He showed that within these limits there existed for helium a maximum of luminous efficiency varying with the diameter of the tube. The larger the section of the tube, the lesser the pressure must be. The diameter of the tube used by this author varied from 1 to 3 millimeters. This therefore involved capillary tubes, not at all comparable to those much larger used for lighting. As far as helium is concerned, one could, by extrapolation of Nutting's data, foresee up to a certain point, results similar to those obtained by Claude with Neon. But these results, applicable to helium, were not necessarily so to Neon, the electric cohesion of which, i. e. the faculty of being illuminated, is much greater. The study of Neon was made from this point of view by Claude alone,

and no one can deny him the results which he has obtained. Therefore his claim of the pressures of the order of one millimeter is justified as far as Neon is concerned, but only as regards Neon. * * *

"This continuous use, indispensable for a tube intended for lighting purposes, has been realized by Claude by combining a pressure of the order of one millimeter and electrodes of a determined surface. * * *

"With regard to pressures, the note of Nutting concerns, as we have pointed out, neither the large tubes, nor the Neon gas." (Italics the court's.)

It will be noted that there is no statement in the foregoing that the pressure of between seven and eight millimeters was known to be the most efficient pressure at the time of Claude's invention.

One of plaintiff's experts, stating that he was a research and technical engineer with the Claude Neon National Laboratories; that he had given expert testimony in different lawsuits throughout the United States; that he was a technical specialist and commercially manufactured neon tubes, testified, in part, as follows as to certain experiments which he had made:

"This is the effect of pressure. At two millimeters pressure, with a tube two feet long and fifteen millimeters in diameter, with a constant electrode area of 7.5 square decimeters per ampere, 144 hours, and the tube hardened. In other words, it died a natural death. At 3.5 millimeters, 456 hours, the tube hardened. At 5. millimeters, 600 hours the tube hardened. At 7 millimeters 2312. 7.5 millimeters, 2,312 hours, and the tube hardened. Eleven millimeters, the tube only ran 720 hours; we got a cracked seal. * * *

"Q. Now, you did not make any experiments with using a pressure of one millimeter of gas? A. Yes.

"Q. Using the same length tube? A. No, it is a different test this time.

"Q. What electrode area did you have at one millimeter? A. I had 17.5 square decimeters per ampere, which is the regular standard electrode, and a tube 36 inches long and 15 millimeters in diameter.

"Q. What life did you get with that? A. With one millimeter I got 46.5 hours, and the tube died a natural death. * * *

"A. At two millimeters with the 7.5 square decimeters per ampere, I obtained a life of 144 hours; at 2 millimeters with exactly the same tube, with the exception of the electrodes being larger 17.5 square decime-

ters per ampere, I obtained a life of 205 hours, which is 71 hours more, with a mere increase of electrode area 7.5 to 17.5 with the same pressure, same tube.

"Q. You also found, however, that increasing the pressure, but using the same tube, from two millimeters to two and one-half millimeters, that you obtained an increase from 144 hours to 456 hours; that is correct, isn't it? A. Yes.

"Q. Now, from those conclusions, state whether or not it is your opinion that the pressure of the gas is an important factor in the life of a tube, that is, the amount of gas used? A. Yes, sir, undoubtedly, as long as it is accompanied by the other elements that are necessary."

Dr. Osborn, professor of physics at the University of Washington, specializing in "spectrumology," a member of the Illuminating Society of America, testifying as an expert on behalf of the defendants, said that he had made experiments with neon tubes at various pressures of gas, and

"Q. What was the longest life obtained by making a tube exactly as specified by Claude—that is, using a pressure of one millimeter? * * * A. Oh, yes. I get the question. The longest life with one millimeter, was fifty hours. That was a long tube. * * *

"Now, you have these six foot tubes, which I think is a much better comparison. In the first tube if you call the volume of the gas—the tubes were of the same size and length—under one millimeter of pressure, you have fifty hours; under two millimeters pressure, in which you have twice the volume, you have 235 hours, and under three millimeters pressure, or three times the volume of gas, you have 360 hours. Now, if you take the ratio of 230 hours to 50 hours, you get 4.6, whereas your volumes were as but one to two. Taking the ratio of 360 to 50, the first and third, your volume relationship are as one to three, and your life is as to seven to two, showing I think rather conclusively that there is another factor there other than the mere volume of neon gas in the tube, and that of course is what I concluded from other experiments that pressure and volume were both important factors, and this shows that the life of the tube is not directly proportional to the volume of gas in the tube."

Plaintiff says (reply brief, pages 24 and 25):

"By employing a tube 5 meters in length for tests, Dr. Osborn's own figures and ratios indicate that a life of approximately

1,000 hours would be obtained from a 3-mm. tube with the electrode used by him, which was approximately 1.5 square decimeters per ampere.

"All of the tests made by Dallons (one of the experts testifying for plaintiff) upon pressure and electrode area were made with 2-foot tubes, and by the ratios worked out in defendants' brief a tube 5 meters in length should have at least seven times the life. By these figures, employing a pressure of 7.5 millimeters and an electrode area of 1.5 square decimeters per ampere in a 5-meter tube, the length of life would be approximately 1,000 hours. * * *

"Claude was speaking only of a minimum pressure, and Dallons' tests show that by increasing the size of the electrode to 7.5 square decimeters per ampere at a pressure of 2 mm. a life of 144 hours is obtained with a 2-foot tube, which would indicate that with a tube 5 meters in length, or the commercial unit used by both defendants and plaintiff, a life of 1,000 hours would be obtained. (R. 623.)"

Consistency of conduct with expressed belief is the touchstone of truth. No one has testified to having made, helped make, or seen made, a neon tube of any size or shape, with a gas pressure of a millimeter of mercury that had a life of 1,000 hours or near 1,000 hours.

Dr. Osborn's position, limited facilities and other duties, may explain why he would rest his opinion as to the length of life of gas tubes on a formula, but no such reason obtains in the case of the plaintiff which is seeking to establish its right to monopolize a substantial, if not an extensive, industry. Why resort to a formula and theory when a course of practice is equally open? No explanation is given of why, if it can be done, Mr. Dallons or some one for plaintiff has not constructed a tube with a pressure of a millimeter of mercury that had a life of 1,000 hours.

The most reasonable explanation appears to be that no way is known in which to construct such a tube that would be useful, if indeed it can be done at all.

The defendants having established the 4th defense and the court so finding, while it may not be necessary to consider the 12th defense, it is not out of place to do so.

It has been contended that the skilled artisan would be able to determine the requisite pressure from the disclosure made in the specification.

In the report of the special master in Electrical Products Corporation v. Neale, Inc., et al., No. K–13–H, Southern District of California, Southern Division, filed April 1st, 1929, it is stated:

"The point has been raised that Claude did not consider the effect of pressure on current density in fixing the size of electrodes. The master finds that Claude is not restricted by the expression of the pressure of the nature of a millimeter to that particular pressure but is entitled to that range of pressure in which his combination of elements will operate efficiently.

"His experiments with large and small tubes show the effect of the amount of gas in the tube on life. The worker in the art to whom the Claude patent speaks is not the glass-blower nor the pumpman, but the trained technician or electrical engineer directing the work in this highly specialized field. Such a person would readily perceive that the amount of gas in the tube could be increased by increasing the pressure as well as by increasing the volume of the tube.

"Claude's combination of elements will function at any pressure within the flat range of the pressure-voltage curve for neon. This is shown on defendants' Exhibit "X", as extending from about 2 millimeters to beyond 27 millimeters. The high pressure tube in this case has no weight in disproving the practical value of the Claude minimum.

"In a high pressure tube efficiency is somewhat sacrificed to reduce electrode area. Although Claude's tube would probably operate at a pressure of 24 millimeters, he did not contemplate the use of such high pressure when he made his minimum specification, and it is doubtful whether a tube of such pressure would ever have been manufactured commercially had it not been for Claude's expression of that limitation."

In Tyler v. Boston, 74 U. S. (7 Wall.) 327 at page 330, 19 L. Ed. 93 the court said: "Now, a machine which consists of a combination of devices is the subject of invention, and its effects may be calculated a priori; while a discovery of a new substance by means of chemical combinations of known materials is empirical, and discovered by experiment. Where patent is claimed for such a discovery, it should state the component parts of the new manufacture claimed with clearness and precision, and not leave the person attempting to use the discovery to find it out 'by experiment.' The law requires the applicant for a patent-right to deliver a writ-

ten description of the manner and process of making and compounding his new discovered compound. The art is new and, therefore, persons cannot be presumed to be skilled in it or to anticipate the result of chemical combinations of elements not in daily use."

The Circuit Court of Appeals in this circuit has held that the sufficiency of disclosure is a question of fact. Schumacher v. Buttonlath Mfg. Co., 292 F. 522.

■ There being no presumption that persons were skilled in this new art, the burden of proving such fact is upon the plaintiff.

There was no prior art to teach the skilled artisan. There was no neon discharge tube then known other than a spectral tube. Nutting, with his helium tube as a photometric standard, was not concerned with securing for it a long life. In the former the capillary phenomena allowed the use of impure neon which is not true in the neon tube lamp. Further, in the spectral tube a long life is not of any particular consequence. It was a long life tube that Claude was striving to perfect, and the only then known gas discharge tube for lighting purposes was Moore's nitrogen tube.

Neon and nitrogen are so entirely different that the teaching of the Moore tube would not assist a skilled artisan in building a neon tube from the specifications of the patent in suit.

In a communication by M. E. Bouty to the French Academy of Sciences, dated January 17, 1910, concerning the dielectric strength of Neon, he states: "There is reason to remark that, in the last Table of atomic weights of Mendeleef (1), neon is not considered as belonging to the same group as helium, argon, crypton and zeon. It forms, by itself alone, a class for which no other term is known."

The neon tube lamp is the basis of a new industry. No one has pointed out where a man skilled in the art would be found at the date of the application for the patent.

There is no presumption that the mere artisan, skilled or unskilled, is familiar with the experiments conducted in the closets and laboratories of scientists.

The only rare gas lamp was the Beck helium lamp. There is no evidence that it was a success or practical. The Beck lamp was an arc lamp and not a discharge tube.

The specifications, teaching a pressure of a millimeter, would not suggest to one skilled or unskilled in the art the feasibility of experimenting with pressures from 400 to 1,000 per cent. greater than that specified.

If the artisan was successful in his first experiment, it would require 1,000 hours for him to learn of his success and the artisan is not so rich in time as to enable him to make such experiments.

It has been argued for plaintiff that Claude was familiar with the law of gases that the volume of the gas varies inversely as the pressure; that it would occur to a skilled artisan that there would be a length of life in a tube correspondingly greater with the increase in pressure because of this law; that an increase in pressure in a shorter or smaller tube would be the equivalent of a greater volume of gas at a lower pressure in a longer or larger tube.

The soundness of this contention is by no means clear. The explanation given for the disappearance of the gas in the operation of the neon tube is that the electric current causes particles of the electrode to fly off from the electrode and be plated on the inner walls of the glass tube in proximity to the electrode. The testimony in the case is that this "sputtering" of the particles from the electrode causes the disappearance of the neon; that it is not because of chemical action but that the particles of the electrode physically capture the particles of the gas and plate or plaster them underneath or within the film made by the particles of the electrode on the inner walls of the tube. Unless there is something more involved in the disappearance of the gas than this action here described, it would not follow that increased pressure is the equivalent of greater volume of gas in this particular for this film made by the particles from the electrode on the walls of the tube does not increase in size with the increased length of the tube or with a change in pressure, and an argument that increased pressure under the described conditions would be the equivalent of greater volume would be no more sound than to contend that the time required for taking apples from a tree would be no greater than that for taking them out of a basket after they were gathered.

The court is unable to agree with the conclusion reached by the master in Electrical Products Corporation v. Neale, quoted above.

As already pointed out the specification calls for a pressure "of the nature of a millimeter." This cannot be understood as the designation of a minimum pressure.

■ A specification must be so clear and exact that any person skilled in the art can

construct the same without further experiment. Tyler v. Boston, 7 Wall, 327, 19 L. Ed. 93.

It is for the jury to determine whether the description is clear enough to enable a mechanic of ordinary skill to construct the machine. Hogg v. Emerson, 52 U. S. (11 How.) 587, 13 L. Ed. 824.

The description must be such as to make disclosure, not to the inventor, but to the ordinary individual skilled as a workman in the field involved. Vacuum Cleaner v. Thompson Mfg. Co. (D. C.) 258 F. 239. See, also, Parker Rust Proof Co. v. Ford Motor Co. (D. C.) 6 F.(2d) 649 at page 654; General Electric Co. v. De Forest Radio Co. (D. C.) 17 F.(2d) 90; Schuricht v. McNutt v. Willis (D. C.) 26 F.(2d) 388.

The specification should make a sufficient disclosure so that one skilled in the art can determine what is necessary without experiment. Howard v. Detroit Stove Works, 150 U. S. 164–167, 14 S. Ct. 68, 37 L. Ed. 1039.

The master in the Neale Case, supra, has found the skilled in the art to be limited to the trained technician or electrical engineer.

The phrase "any person skilled in the art or science" is not confined to the most eminent scientists, nor the most able experts in that science or art; but it also indicates persons whose skill may stop short of the highest excellence. Tannage Patent Co. v. Zahn (C. C.) 66 F. 986; Section 217, Walker on Patents (6th Ed.), p. 288.

It is true the above case was reversed [C. C. A.] 70 F. 1003) but the above holding was in no way criticized. The District Court held the patent invalid but the Circuit Court of Appeals reversed the holding and upheld the patent.

In considering the language of Justice Bradley in Loom Co. v. Higgins, 105 U. S. 580, at page 585, 26 L. Ed. 1177, to the effect: "With this mass of previous knowledge and nomenclature in their minds, as we must suppose it to have been; the language, the explanations, the drawings and the claims of Webster's patent must have been perfectly intelligible to them. When an astronomer reports that a comet is to be seen with the telescope in the constellation of Auriga, in so many degrees of declination, and so many hours and minutes of right ascension, it is all Greek to the unskilled in science; but other astronomers will instantly direct their telescopes to the very point in the heavens where the stranger has made his entrance into our system."

The character of the art considered in that case should be taken into account. It involved letters patent for improvements in looms for weaving carpets. Weaving was old at the birth of the Christian era. The quoted language of Justice Bradley in the above case is preceded by the following: "The loom itself was old. Every part of it was familiar to every loom manufacturer and to every weaver. Its lathe, its treddles, its breast beam, its shuttle boxes and shuttle slide were as well known to all those concerned in the weaving of pile fabrics as the plough or the cultivator is to the farmer. * *. * All these things were as well known as the alphabet to all those skilled in the art of pile weaving, as it then stood."

In A. B. Dick Co. v. Barnett (C. C. A.) 288 F. 799, a 1914 patent involving a process of forming a fibrous stencil sheet was under consideration. The lower court reviewed the art as far back as 1874. A. B. Dick Co. v. Underwood Typewriter Co. (D. C.) 246 F. 309.

In Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585 at page 621, the patent related to improvements in adding and recording machines, which was not a new art.

The gap that separates arts such as are considered in those cases from the neon discharge tube is realized when it is considered that prior to the patent application there was no neon discharge tube lamp and no other discharge neon tube than a spectral tube in which, because of the capillary phenomena and the absence of a necessity for a lamp of long life, therefore there is little or nothing to teach the solution of the problem of long life in such a tube.

The fault with the specification in the instant case is not that it is obscure to the uninitiated, but that it fails in any way to indicate the pressure necessary to success.

Dr. McKeown testifies (Tr. page 1291): "This means, then, that the pressure at which he was operating or at least the pressure initially in this tube was greater than the pressure at which the potential difference or voltage is a minimum. Now, that value for the potential difference *is known,* and it is approximately eight millimeters pressure." (Italics the court's.)

It is significant that Dr. McKeown nowhere states that it was known at the time the patent was applied for.

If the question was merely a question of gas reserve, the contention that it would oc-

cur to a person skilled in the art to experiment with gas pressures would be more plausible. The Circuit Court in this circuit has had occasion to comment on "a nicely balanced relation of each to the other" of elements entering into a combination patent. Schumacher v. Buttonlath Mfg. Co. (C. C. A.) 292 F. 522 at page 531.

In General Electric Co. v. Nitro-Tungsten Lamp Co. (C. C. A.) 266 F. 994 at page 998, the court said:

· "Every design or machine is in a sense a compromise, and it is unquestionably true that during the whole history of electric incandescent lighting there had been suggestions that it would be possible to utilize a gaseous filling (usually nitrogen) in the bulb that the life of the filament might be extended. Thus Prof. Anthony said before the American Institute of Electrical Engineers in 1894:

" 'With such a gas (bromine) in the lamp and a properly proportioned filament, the initial efficiency may be carried as high as in the vacuum lamp, and the efficiency and illuminating power will be well preserved to the end.'

"Yet he qualified the assertion by saying:

" 'If we could in any way * * * further check the circulation of the gas within the lamp chamber, we should still further check the waste of the filament and prolong the life of the lamp.'

"But neither he nor his principals ever did it."

The density of the current, the electrode area, and the gas pressure all affect the amount of "sputtering" and the "sputtering" of neon gas greatly differs from that of any other gas. The internal diameter of the tube may also be a factor affecting the amount of gas caught by the electrode particles and carried to the tube wall. The variance in potential resulting from the current density, electrode area and gas pressure, having a relation to the amount of "sputtering," if the pressure at which that difference in potential was least, was well known at the time of the patent application it is assumed, but not decided, that the patent would be valid, despite the misleading disclosure of the specification. But, as already pointed out, the art being new, it is not to be presumed, and if not presumed, the burden is on the plaintiff to prove the existence of such knowledge.

As stated, Dr. McKeown testified: "This means, then, that the pressure at which he was operating or at least the pressure initially in this tube was greater than the pressure at which the potential difference or voltage is a minimum. Now, that value for the potential difference is known, and it is approximately eight millimeters pressure.".

There has been no evidence that this critical point was, at the time of the patent application, known to any one.

In Abrahams v. Universal Wire Co. (D. C.) 10 F.(2d) 838 at pages 841 and 842, the court said: "The defendant contends that the disclosure of the patent is not sufficiently complete with reference to the composition of the water soluble filler, but it does not seem to me that the patentee was bound to give a formula specifically describing the relative quantities of glue and dextrine, because it appears from the testimony that in very damp places it may be better to use dextrine alone, and by the same process of reasoning it would appear that it might be better to vary the proportions of glue and dextrine in other places, and these are matters which one skilled in the art could well determine, and it is not necessary in the patent to describe *all the possible modes of application in order to obtain the best results.* Minerals Separation, Ltd., v. Hyde, 37 S. Ct. 82, 242 U. S. 261, 61 L. Ed. 286." (Italics that of this, not that, court.)

In the instant case, by failing to indicate the required pressure, there was a failure not only to disclose the best pressure or any useful pressure, but a putting on the wrong road by describing a pressure which would make the lamp useless. The foregoing case and Producers' & Refiners' Corporation v. Lehmann (C. C. A.) 18 F.(2d) 492–495, 496, were decided upon the authority of Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, in which, at page 270, 37 S. Ct. 82, 86, 61 L. Ed. 286, it was said:

"Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and *the certainty which the law requires in patents is not greater than is reasonable,* having regard to their subject matter. *The composition of ores varies infinitely, each one presenting its special problem,* and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of sub-

stances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law. *Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860; Ives v. Hamilton, 92 U. S. 426, 23 L. Ed. 494;* and *Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 437, 22 S. Ct. 698, 46 L. Ed. 968, 985, 986.* (Italics that of this, not that, court.)

Such variation to meet conditions is not present in the case of the neon lamp. There is no testimony but what a pressure between 7 and 8 millimeters of mercury is the most efficient pressure under all conditions.

The patentee states that a lower pressure is one of the means of obtaining a yellowish light. This does not appear to be important for the following reason: There is no evidence that a tube giving a yellowish light would have length of life sufficient to make of it a useful thing, even were it conceded that there was a demand for a lamp of this character which might justify a presumption of its usefulness.

*Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527,* was a case, not of a failure to disclose that which was necessary to success, but a failure to describe all of the resulting advantages and reasons for them of the thing which itself was fully described in the patent.

In holding the disclosure sufficient in *General Electric Co. v. Nitro Tungsten Lamp Co.* (C. C. A.) 266 F. 994 at page 1000, it was said: "It was impossible to give exact measurements, because the economic object of the lamp was to diminish the wattage per candle, and dimensions must be proportioned to the designed wattage; i. e.. substantially to the size of the lamp—something to be worked out according to rules presumably long familiar to a competent electrical engineer."

In *Karesh v. Shell-On Sol-Ted Peanut Co.* (D. C.) 17 F.(2d) 496 at page 500, the court said: "It is true that the time and the amount of the pressure are not definitely fixed, but it should be borne in mind that the nature of the subject-matter makes it impossible to prescribe them accurately. Peanuts vary as to the thickness of the shells, and the pressure must vary with it. The end in view is made perfectly clear by the express terms of the specification. The pressure must be sufficient to cause the solution to penetrate the pores of the shells without breaking the shells. While it might have been possible to

have approximated the number of pounds pressure per square inch, and the time during which it should be applied, nevertheless it is clear that, in the absence of such approximation, the proper pressure to be used can be readily ascertained by one endowed with mechanical skill. For the comprehension of persons skilled in the art, the requirements as to pressure are sufficiently definite. *Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553; Mowry v. Whitney, 81 U. S. (14 Wall.) 620, 626, 20 L. Ed. 860.*"

In the foregoing case the problem of pressure would not appear to have been complicated by other conditions than that of merely overcoming resistance, but in the present case, before making experiments with pressure, the artisan would be restrained by the knowledge that sputtering varied with pressure and that what he might be gaining in volume of gas with increased pressure he might be losing because of increased sputtering, or for other reasons unknown to the court or to him.

In *Abrahams v. Universal Wire Co.* (D. C.) 10 F.(2d) 838 at page 842, it was held that the patentee was not bound to give a formula describing relative quantities because it might be necessary to vary such quantities owing to moisture, and that it wasn't necessary in the patent to describe all of the modes of application in order to obtain the best results, the court concluding that these were matters which one skilled in the art could well determine.

These authorities lend no support to plaintiff for the question of the particular application of pressure beyond that of a millimeter is not left open to be solved by experiment, nor that of a useful pressure disclosed with the way pointed out by experiment to vary it to meet different conditions or particular needs.

The disclosure here is a misleading disclosure. It fixes the attention on a pressure useless in such art for all purposes. It puts one experimenting or inquiring upon the wrong road to the end sought.

As the initial pressure is lowered by the cleansing of the tube a misleading disclosure as to the amount of pressure in the finished tube would be a great disadvantage.

Experiment may be merely the work of the skilled artisan where it is necessary to modify a specified standard formula in order to meet a particular and variable need, if it be a closely related one, but experiment necessary to turn the useless thing into one

727

which is useful in no way makes the useless formula an invention.

In Tyler v. Boston, 74 U. S. (7 Wall.) 327 at page 330, 19 L. Ed. 93, the claim was for crude fusel oil in one part and kerosene one part, with a statement of substitution by naptha or crude petroleum for kerosene in which the exact quantity of fusel oil necessary to produce the most desirable compound must be determined by experiment. Of this the court said: "Where a patent is claimed for such a discovery, it should state the component parts of the new manufacture claimed with clearness and precision, and not leave the person attempting to use the discovery to find it out 'by experiment.'"

In Schumacher v. Buttonlath Mfg. Co., 292 F. 522, 531, 532, 533, the Circuit Court of Appeals for this circuit considers the question of sufficient disclosure. A specification was held sufficient which called for use of paper treated to retard permeation by moisture without explaining how it was to be treated to accomplish the result, but the following appears:

"Bruce F. Brown, a paper mill superintendent, called as a witness by the defendant, but afterwards by the plaintiffs, conceded by both sides of the controversy, as well as by the court, to be duly qualified and fair and unbiased, testified:

"That 'hardsize' paper 'means the percentage of rosin sizing that is put into the sheet to make it water resistant.' 'We make it (the paper) in different layers with different degrees of sizing.'

"The witness was asked:

"'If a person ordering paper specified that the moisture should come through surely inside of 10 minutes, would you be able to comply with that specification in the ordinary course of paper making?'

"The witness answered: 'In paper board making, I would say yes.'"

That is, the plaintiff in that case showed by defendants own witness that the thing called for in the specification was well known in the paper making art.

In the case of the Incandescent Lamp Patent, 159 U. S. 465 at page 474, 16 S. Ct. 75, 40 L. Ed. 221, the question of required experiment was considered. The court, at page 474 of 159 U. S., 16 S. Ct. 75, 78, stated: "If the description be so vague and uncertain that no one can tell, except by independent experiments, how to construct the patented device, the patent is void."

In the instant case no one could construct a successful neon tube lamp without independent experiments as to gas pressure.

In Mitchell v. Tilghman, 86 U. S. (19 Wall.) 287, at page 400, 22 L. Ed. 125, the Court said: "Other differences also exist, as for example, instead of being worked at a temperature of 510° or 612° Fahr., and in a vessel capable of sustaining an internal pressure of two thousand pounds to the square inch, the process of the witness is worked at a temperature represented by a pressure of only three hundred pounds to the square inch; which is a latitude of deviation not warranted by any language to be found in the complainant's specification."

Having reached the conclusion that the 13th defense is established and that the patent is void because of the insufficient disclosure as to gas pressure, it is not necessary to consider the numerous other matters which have been presented in this case nor the 11th defense.

The bill of complaint will be dismissed. Defendants will recover their costs.

The decree will be settled upon notice.